**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

THE ESTATE OF RUSSELL MECHLING,
*Plaintiff*,

v.

U.S. BANK NATIONAL ASSOCIATION
and FINANCIAL CREDIT INVESTMENT
III SPV-A (CAYMAN), L.P.,
*Defendants.*

No. 3:23-cv-25 (VAB)

**RULING AND ORDER ON MOTIONS TO DISMISS**

The Estate of Russell Mechling ("the Estate" or "Plaintiff"), by its Executor Ellen Ulmer, has sued U.S. Bank National Association ("US Bank") and Financial Credit Investment III SPV-A (Cayman), L.P. ("FCI Cayman") (collectively, "Defendants"). The Estate alleges that FCI Cayman was the beneficial owner, and US Bank was the securities intermediary and owner of record, of two $5 million stranger-originated life-insurance ("STOLI") policies illegally taken out on Mr. Mechling's life. Second Am. Compl. at 1,[1] ECF No. 106 (Sept. 6, 2023) ("Second Am. Compl."). The Estate now seeks to recover the death benefits received by Defendants, alleging one claim for recovery of insurance proceeds under Wisconsin law and a second claim for recovery under a theory of unjust enrichment. *Id.*

Both US Bank and FCI Cayman have filed motions to dismiss the Complaint in its entirety for lack of standing and lack of personal jurisdiction. *See* Mot. to Dismiss, ECF No. 111 (Sept. 20, 2023) ("US Bank Mot."); Mot. to Dismiss, ECF No. 114 (Sept. 29, 2023) ("FCI Cayman Mot.").

For the following reasons, the motions to dismiss are **DENIED**.

---

[1] Where ECF-generated page numbers differ from internal page numbers, the ECF-generated page numbers are used.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

#### a.   The Parties

Ellen Ulmer, the daughter of Mr. Mechling and a Pennsylvania citizen, is the Executor of the Estate, established on November 12, 2020, following the death of Mr. Mechling, also a citizen of Pennsylvania. Second Am. Compl. ¶ 1. The Estate too is a citizen of Pennsylvania. *Id.*

US Bank is a national banking association and a citizen of Ohio. *Id.* ¶ 2.

FCI Cayman is a Cayman Islands limited partnership believed to be co-owned by an Irish entity and a corporation believed not to be a citizen of Pennsylvania. *Id.* at 3. FCI Cayman is not a citizen of Pennsylvania. *Id.*

Since at least 2017, FCI Cayman has been managed, directly or indirectly, by Apollo Global Management ("Apollo"). *Id.* ¶ 4. Since at least 2017, Apollo has made decisions and provided advice on FCI Cayman's behalf and for FCI Cayman's benefit and has provided management services to FCI Cayman. *Id.* ¶¶ 5–6.

Since at least 2010, Apollo Management Holdings, L.P. ("Apollo LP") has acted for the benefit of and at the direction of Apollo. *Id.* ¶ 8. Since at least 2020, Apollo LP has been based in Greenwich, Connecticut and has been an affiliate of Apollo. *Id.* ¶ 7.

PHL Variable Insurance Company ("PHL") is an insurance carrier headquartered in Hartford, Connecticut. *Id.* ¶ 49.

#### b.   The Events

In 2007, a Wisconsin corporation named Oceanus LLC ("Oceanus") procured at least two insurance policies ("the Policies") on the life of Mr. Mechling. *Id.* ¶ 24. The Policies were not procured for the benefit of Mr. Mechling or his family, and none of them ever paid or were

expected to pay any premiums on these policies. *Id.* The Policies were issued by PHL. *Id.* Oceanus did not have an insurable interest in Mr. Mechling's life; therefore, the Policies were STOLI policies, allegedly illegal in Wisconsin. *Id.* ¶¶ 13–14, 25.

Oceanus applied for the Policies through a California trust named the Russell B. Mechling, Jr. Irrevocable Life Insurance Trust (the "California Trust"). *Id.* ¶ 26. Oceanus created two Wisconsin trusts—the Russell B. Mechling, Jr. 2007 Irrevocable Trust (the "Master Trust") and the Russell B. Mechling, Jr. Irrevocable Subtrust (the "Sub-Trust")—each with a Wisconsin trustee, to hold the Policies and any interests therein. *Id.* By the time the Policies were issued, the California Trust had been merged into the Wisconsin Sub-Trust without the knowledge of PHL. *Id.*

Oceanus caused the execution of a Beneficial Interest Option Agreement, which granted it the right to purchase the beneficial interest in the Sub-Trust (and therefore the Policies) between one and two years after the Policies were issued. *Id.* ¶ 28. About two years after the Policies were issued, the beneficial interest in the Sub-Trust was transferred to Oceanus. *Id.* ¶ 29.

By 2011, US Bank had been engaged to serve as the Policies' securities intermediary and record owner and was responsible for making all premium payments to PHL, corresponding with PHL, and collecting death benefits from PHL on behalf of the Policies' beneficial owner. *Id.* ¶ 31.

In 2017, FCI Cayman acquired the Policies. *Id.* ¶ 32. Before this acquisition, both Apollo and Apollo LP expressed concern that policies originated through Oceanus may not have been supported by an insurable interest at the time of their inception. *Id.* ¶¶ 33–34.

3

US Bank continued to act as the securities intermediary for FCI Cayman, paying premiums, contacting Mr. Mechling and his family to check on his health status, procuring Mr. Mechling's medical records, and communicating with PHL about the Policies. *Id.* ¶¶ 37–40.

On October 16, 2020, Mr. Mechling died. *Id.* ¶ 41.

In January 2021, US Bank invoked its rights as owner and beneficiary of record to require PHL to pay the Policies' death benefits. *Id.* ¶¶ 42–43. PHL issued a check payable to US Bank for $10,069,041.10 (the death benefits plus accrued interest). *Id.* ¶¶ 43–44.

On January 15, 2021, US Bank transferred the death benefits to FCI Cayman. *Id.* ¶ 46.

### B. Procedural History

On January 6, 2023, the Estate filed a Complaint against US Bank and "John Doe," the business entity that received the proceeds from the two $5 million STOLI policies. Compl., ECF No. 1.

On February 8, 2023, US Bank filed a motion to dismiss. Mot. to Dismiss, ECF No. 24; Mem. in Support of Mot. to Dismiss, ECF No. 25.

On February 28, 2023, the Estate filed a memorandum in opposition to US Bank's motion to dismiss. Mem. in Opp'n to Mot. to Dismiss, ECF No. 29.

On March 14, 2023, US Bank filed a reply to the Estate's memorandum in opposition to the motion to dismiss. Reply to Response to Mot. to Dismiss, ECF No. 32.

On April 7, 2023, the Estate filed a motion to amend or correct the Complaint, in order to specifically identify the Defendant previously referred to as "John Doe." Mot. to Amend/Correct, ECF No. 45; Mem. in Support of Mot. to Amend/Correct, ECF No. 46.

On April 28, 2023, US Bank filed a memorandum in opposition to the motion to amend. Mem. in Opp'n to Mot. to Amend/Correct, ECF No. 47.

On May 2, 2023, the Estate filed a reply to US Bank's memorandum in opposition to the motion to amend. Reply to Response to Mot. to Amend/Correct, ECF No. 48.

On August 2, 2023, the Court granted the Estate's motion to amend and denied US Bank's motion to dismiss as moot. Order, ECF No. 75.

On August 2, 2023, the Estate filed an Amended Complaint against US Bank and FCI Cayman. Am. Compl., ECF No. 76.

On August 16, 2023, US Bank filed a motion to dismiss the Amended Complaint. Mot. to Dismiss, ECF No. 87; Mem. in Support of Mot. to Dismiss, ECF No. 88.

On September 1, 2023, the Estate filed a Second Amended Complaint. Second. Am. Compl., ECF No. 106.

On September 20, 2023, US Bank filed a motion to dismiss the Estate's Second Amended Complaint. Mot. to Dismiss the Second Am. Compl., ECF No. 111 ("US Bank Mot."); Mem. in Support of Mot. to Dismiss the Second Am. Compl., ECF No. 112 ("US Bank Mem.").

On September 29, 2023, FCI Cayman filed a motion to dismiss the Second Amended Complaint. Mot. to Dismiss, ECF No. 114 ("FCI Cayman Mot."); Mem. of L. in Support of Mot. to Dismiss, ECF No. 114-1 ("FCI Cayman Mem.").

On October 10, 2023, the Estate filed a memorandum in opposition to US Bank's motion to dismiss. Mem. in Opp'n to Mot. to Dismiss, ECF No. 119 ("Opp'n to US Bank Mot.").

On October 20, 2023, the Estate filed a memorandum in opposition to FCI Cayman's motion to dismiss. Memo. in Opp'n to Mot. to Dismiss, ECF No. 130 ("Opp'n to FCI Cayman Mot.").

On October 24, 2023, US Bank replied to the memorandum in opposition to its motion to dismiss. Reply to Response to Mot. to Dismiss, ECF No. 133 ("US Bank Reply").

On October 25, 2023, US Bank moved to join FCI Cayman's motion to dismiss. Mot. for Joinder, ECF No. 134.

On November 3, 2023, FCI Cayman filed a reply to the response to its motion to dismiss. Reply to Response to Mot. to Dismiss, ECF No. 138 ("FCI Cayman Reply").

On January 10, 2024, the Estate filed a notice of additional authority relevant to the Article III standing issues raised in FCI Cayman's motion to dismiss. Not. of Add'l Auth., ECF No. 153 ("Not. of Auth.").

## II.   STANDARD OF REVIEW

Defendants have moved to dismiss this action for lack of subject matter jurisdiction and lack of personal jurisdiction, under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2), respectively.

### A.  Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under [Federal] Rule [Rule of Civil Procedure] 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)). The plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject matter jurisdiction over the claims. *See id.*

"When considering a motion to dismiss [under] Rule 12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000); *see also Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (quoting *Sweet*, 235 F.3d at 83). The court, however, may also resolve disputed jurisdictional issues "by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Karlen ex rel. J.K. v. Westport Bd. of*

*Educ.*, 638 F. Supp. 2d 293, 298 (D. Conn. 2009) (citing *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000)).

### B.  Rule 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003). The plaintiff therefore must make a *prima facie* showing that jurisdiction exists. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

"This prima facie showing must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Id.* (internal quotation marks omitted); *see also Glenwood Sys., LLC v. Med-Pro Ideal Sols., Inc.*, No. 3:09-cv-956 (WWE), 2010 WL 11527383, at *2 (D. Conn. May 4, 2010) ("At this stage of the proceedings, if the court relies upon pleadings and affidavits, the plaintiff must make out only a *prima facie* showing of personal jurisdiction, and the affidavits and pleadings should be construed most favorably to the plaintiff."), *aff'd*, 438 Fed. App'x 27 (2d Cir. 2011) (citing *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986)). A court considers the facts as they existed when the plaintiff filed the complaint. *See id.* (citing *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 52 (2d Cir. 1991)).

### III.  DISCUSSION

The Estate has sued US Bank and FCI Cayman to recover the proceeds of the Policies under Wisconsin law or, in the alternative, under a theory of unjust enrichment. Second Am. Compl. ¶¶ 70–79. The Estate claims that, under Wisconsin law, STOLI policies are illegal. WI

ST § 631.07(1) ("No insurer may knowingly issue a policy to a person without an insurable interest in the subject of the insurance."). The Estate seeks judgment against Defendants under WI ST § 631.07(4), which states that "a court with appropriate jurisdiction may order the proceeds [of such an illegal policy] to be paid to someone other than the person to whom the policy is designated to be payable, who is equitably entitled thereto, or may create a constructive trust in the proceeds or a part thereof, subject to terms and conditions of the policy other than those relating to insurable interest or consent." It also asserts that the Policies were an illegal wager on Mr. Mechling's life, in violation of public policy, which has enriched Defendants at the expense of the Estate, thereby equitably entitling the Estate to the death benefits.

Both FCI Cayman and US Bank have filed motions to dismiss the Second Amended Complaint in its entirety. US Bank argues that the Complaint should be dismissed because the Second Amended Complaint was filed without the permission of Defendants or the Court, in violation of Fed. R. Civ. P. 15(a), and because the Court lacks personal jurisdiction over US Bank. US Bank Mem. at 6–7. FCI Cayman argues that the Complaint should be dismissed: (1) for lack of subject matter jurisdiction because the Estate has not been injured and therefore lacks Article III standing, and (2) because the Estate has not alleged facts sufficient to establish personal jurisdiction over FCI Cayman under Connecticut's long-arm statute or the Due Process Clause of the Constitution. FCI Cayman Mot. at 1–2.

The Court first addresses the propriety of the Second Amended Complaint, and then addresses subject matter jurisdiction and personal jurisdiction in turn.

### A. The Second Amended Complaint

Under Federal Rule of Civil Procedure 15(a)(1), "[a] party may amend its pleading once as a matter of course" within 21 days of serving it or receiving a response. When unable to

amend its pleading as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Courts are instructed to "freely give leave when justice so requires." *Id.*; *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman*, 371 U.S. at 182 (quoting Fed. R. Civ. P. 15(a)). An amendment is considered futile if the proposed new claim would not withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Nat'l Rifle Assoc. of America v. Cuomo*, 480 F. Supp. 3d 404, 412 (N.D.N.Y. 2020); *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991).

US Bank argues that because the Estate did not seek its or the Court's permission to file its Second Amended Complaint, in accordance with Rule 15(a)(2), the Complaint "should be disregarded and stricken from the docket." US Bank Mem. at 9. US Bank further argues that, because the Estate's filing of the Second Amended Complaint violated the Scheduling Order,[2] the Estate was required to demonstrate good cause before filing it (and thereby modifying the scheduling order). *See* Fed. R. Civ. P. 16; *Geomatrix Sys., LLC v. Eljen Corp.*, No. 3:20-CV-1900 (JBA), 2023 WL 2895899, at *3 (D. Conn. Apr. 11, 2023) (citing *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000) ("It is well-settled in this Circuit that the Rule 16(b) 'good cause' standard, rather than the more liberal standard of Rule 15(a), governs a motion to amend filed after the deadline a district court has set for amending the pleadings.").

---

[2] The Scheduling Order set a July 7, 2023 deadline for amended pleadings. *See* ECF No. 43 (Apr. 6, 2023). On August 2, 2023, the Court granted the Estate leave to amend its complaint. Order, ECF No. 75. The Estate filed its First Amended Complaint the same day. Am. Compl. The Estate's Second Amended Complaint was filed September 6, 2023. Second Am. Compl.

The Second Amended Complaint includes additional allegations regarding US Bank's role in the alleged STOLI policy, including its involvement as securities intermediary as early as 2011, as well as more detail about the types of actions taken by US Bank in that role. Second Am. Compl. ¶¶ 30–32, 40, 55–56. US Bank argues that these additional allegations merely "regurgitate[] virtually all of the same alleged facts that the Estate raised" in previous filings. US Bank Mem. at 11. As a remedy, US Bank proposes striking the Second Amended Complaint in its entirety, and argues that, because the Estate never answered its motion to dismiss the First Amended Complaint, that Complaint should be dismissed, as well. *Id.* at 15.

The Estate responds that it filed its First Amended Complaint with permission of the Court, *see* Order, ECF No. 75 (Aug. 2, 2023), and that its Second Amended Complaint was therefore its first amended pleading filed as a matter of course under Fed. R. Civ. P. 15(a)(1). Opp'n to US Bank Mot. at 10–11. The Estate further argues that, because its Second Amended Complaint was filed in accordance with Rule 15(a)(1), it was not required to ask permission or to demonstrate good cause before filing. *Id.* at 11.

The Court disagrees with both parties.

As a preliminary matter, the Second Circuit has not yet addressed the question of whether a plaintiff waives their right to amend as a matter of course under Rule 15(a)(1) if they first amend their complaint under Rule 15(a)(2). *See Adams v. Tops Markets*, *LLC*, No. 21-CV-753 (JLS) (HKS), 2023 WL 4828029, at *2 (W.D.N.Y. July 7, 2023). Courts in other Circuits have taken different approaches. *See, e.g.*, *Ramirez v. Cnty. of San Bernardino*, 806 F.3d 1002, 1007 (9th Cir. 2015) ("[A] plaintiff may file his first amended complaint with consent from the opposing party, which satisfies Rule 15(a)(2)" and "[h]e may thereafter utilize his one matter of course amendment under 15(a)(1), so long as he files it timely."); *Coventry First, LLC v.*

*McCarty*, 605 F.3d 865, 869–70 (11th Cir. 2010) ("[The Plaintiff] . . . never filed an amended complaint as a matter of course. Instead, it chose to file a motion to amend. We conclude that, in doing so, it waived the right to amend as a matter of course and it invited the District Court to review its proposed amendments."). Within this Circuit, district courts have approached the issue differently, as well. *Compare Doe #1 v. Syracuse Univ.*, 335 F.R.D. 356, 360 (N.D.N.Y. 2020) (holding that Plaintiffs "did not use or waive their Rule 15(a)(1) right to amend" where both prior amendments were made under Rule 15(a)(2) and the third amendment met the requirements of Rule 15(a)(1)), *with*, *Adams*, 2023 WL 4828029, at *2 ("The Court concludes that, by filing her first amended complaint with Defendant's consent under Rule 15(a)(2), Plaintiff's right to amend as a matter of course under Rule 15(a)(1) was extinguished.").

Thus, the law is unclear as to whether the Estate could file a Second Amended Complaint as a matter of course, or whether it required the permission of Defendants or the Court. In any event, the Court need not reach this issue because, as noted by US Bank, the Estate's Second Amended Complaint was not filed timely, according to the Scheduling Order. "It is well-settled in this Circuit that the Rule 16(b) 'good cause' standard, rather than the more liberal standard of Rule 15(a), governs a motion to amend filed after the deadline a district court has set for amending the pleadings." *Parker*, 204 F.3d at 340; *Geomatrix Sys., LLC*, 2023 WL 2895899, at *3. Similarly, under the District of Connecticut's Local Rules of Civil Procedure, a scheduling order "shall not be modified except by further order of the Court on a showing of good cause." D. Conn. L. R. Civ. P. 16(b). "The good cause standard requires a particularized showing that the schedule cannot reasonably be met, despite the diligence of the party seeking the modification, for reasons that were not reasonably foreseeable when the parties submitted their proposed case management plan." *Id.* The presiding judge may, however, *sua sponte* modify a scheduling

order. D. Conn. Civ. Standing Orders, Standing Order on Scheduling in Civil Cases ¶ 3 (July 30, 2018).

As noted above, leave to amend the filings in a given case should generally be freely given where justice so requires. *Foman*, 371 U.S. at 182. Moreover, "district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases." *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016).

Here, the Estate filed its Second Amended Complaint, amidst ongoing and contested discovery, to include additional factual allegations, which US Bank concedes had already been alleged in previous filings by the Estate. These additional allegations are helpful in addressing questions regarding personal jurisdiction, addressed in Section C, and US Bank has not identified any undue delay, bad faith, or dilatory motive on the Estate's part, nor any undue prejudice that it has suffered on the basis of the amendment.

Accordingly, consistent with its inherent authority to manage its docket, including modifying pre-trial scheduling orders, *Dietz*, 579 U.S. at 47, the Court will accept the Estate's Second Amended Complaint and consider it the operative pleading in this case.

### B. Standing

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Standing generally requires a plaintiff to establish: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992). Article III therefore limits

federal courts to deciding only "real controvers[ies] with real impact on real persons."
*TransUnion LLC*, 594 U.S. at 424, citing *Am. Legion v. Am. Humanist Assn.*, 139 S. Ct. 2067, 2103 (2019) (Gorsuch, J., concurring).

FCI Cayman challenges the Estate's standing to bring this suit only under the concrete harm requirement. Thus, the Court focuses its discussion of standing on the first of the three *Lujan* requirements.

Concrete harms most classically entail tangible harms, such as physical or monetary harms, but also may include some intangible harms, such as "injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts."
*TransUnion LLC*, 594 U.S. at 425 (citing *Spokeo v. Robins*, 578 U.S. 330, 340–41 (2016)). When determining whether a given injury is concrete, Congress's views may be instructive. But, while "[c]ourts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation[,]" such an action does not relieve courts of their responsibility to independently determine whether a plaintiff has suffered concrete harm under Article III. *TransUnion LLC*, 594 U.S. at 425. In other words, "[o]nly those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.*

FCI Cayman argues that "[t]he Estate has made no attempt to allege it suffered any injury or harm whatsoever." FCI Cayman Mem. at 11. It further notes that the Estate has not alleged that it incurred any pecuniary loss when the Policies were procured, nor that it suffered any damage when the benefits were paid to US Bank, and eventually FCI Cayman. *Id.* at 12. FCI

Cayman emphasizes that under *TransUnion*, even if a statutory cause of action exists, the plaintiff must allege concrete injury in order to establish standing in federal court. *Id.* at 14.

The Estate responds that it has alleged a concrete harm: monetary loss. Because the Estate maintains that the Policies were never validly transferred out of the trust to which Mr. Mechling's heirs were beneficiaries, it claims that Defendants have been unjustly enriched and the Estate has incurred a monetary injury. Opp'n to FCI Cayman Mot. at 21. The Estate further argues that *TransUnion* is inapplicable to this case because the claim involves a cause of action derived not from statute, but from Wisconsin's common law. *Id.* at 23. WI ST § 631.07(4) does not create a cause of action, but rather codifies Wisconsin's long-standing common law. *Id.* at 24. Regardless, the Estate maintains that it has satisfied the *TransUnion* test because "being the subject of a human life wager . . . has long been recognized as a harm providing a basis for a lawsuit in American courts." *Id.* at 28. In support of this contention, the Estate cites: (1) what it characterizes as a body of pre-*Erie* federal common law; (2) a number of modern federal cases in which it claims federal courts have allowed insureds' estates to bring suit to recover the proceeds of life insurance policies; and (3) a number of similar state court decisions from around the country. *Id.* at 30 –31. Finally, the Estate claims that it has suffered intangible harms analogous to those protected by intrusion upon seclusion, appropriation, and disclosure of private facts. *Id.* at 32–37.

FCI Cayman replies that "there is no allegation that [the Policies] cost Mr. Mechling a single dollar" and Mr. Mechling and his heirs did not retain any legitimate, residual interest in the Policies. FCI Cayman Reply at 3–4. It further notes that, in the absence of a monetary injury, a plaintiff "needs more than an interest in the bounty he will receive if the suit is successful to demonstrate standing." *Lawyers' Comm. For 9/11 Inquiry, Inc. v. Garland*, 43 F.4th 276, 282

(2d Cir. 2022) (internal quotation marks omitted). FCI Cayman also argues that the various privacy invasions alleged by the Estate are ordinary and uncontroversial features of all life insurance policies; that the Estate has not sought to vindicate these alleged informational harms through injunctive relief or money damages, but rather seeks to recover the death benefits themselves; and that there is no suggestion that Mr. Mechling did not consent to the issuance of the Policies. FCI Cayman Reply at 4–6. Finally, FCI Cayman alleges that being the subject of a human life wager is a "metaphysical injury" that is not a cognizable Article III injury, nor one rooted in any history or tradition. *Id.* at 6–7. FCI Cayman disputes that there is any relevant federal common law tradition and argues that the only applicable state common law rule allowed the insurer, not the estate of the insured, to "raise the objection of want of an insurable interest." *Id.* at 7, quoting 3 Couch on Ins. § 41:5 (2021); *see also Opitz v. Karel*, 118 Wis. 527, 527 (1903) ("Any objections to a transfer of this policy which this company might have made under this condition are not available to the defendant, as the personal representative of the deceased, nor any other person interested in his estate.").

The Estate filed a notice of additional authority advising the Court that a court in the District of Minnesota recently held that the estates of STOLI insureds have Article III standing to pursue the proceeds of such policies in federal court. *See Estate of Ann Boggess, et al. v. U.S. Bank, et al.*, Civil No. 23-45 (DWF/DJF), 2024 WL 100839 (D. Minn. Jan. 9, 2024).

The Court agrees.

To be clear, the Estate has not alleged that Mr. Mechling or his Estate paid any premiums or otherwise incurred any monetary loss as a result of the Policies. As a result, although it asserts a right to the death benefits paid to FCI Cayman, such a claim does not alone qualify as a harm sufficient to establish standing. *See Lawyers' Comm. For 9/11 Inquiry, Inc.*, 43 F.4th at 282

(holding that a plaintiff's interest in the "bounty" he would receive if the suit was successful is insufficient to establish standing).

Nor has the Estate pled facts sufficient to establish any privacy-related injuries. In the absence of any allegations that Mr. Mechling did not consent to Oceanus taking out the policies, it is difficult to see how the Estate could have standing to bring a claim of appropriation. Similarly, the Estate has not alleged that the communications from FCI Cayman and US Bank to check on the status of Mr. Mechling's health differed from those communications typically entailed by legitimate life insurance policies, nor that they upset or otherwise harmed Mr. Mechling or his family. The Estate thus has not alleged any harms analogous to common law invasion of privacy torts, such as intrusion upon seclusion or publication of private facts.

Nevertheless, this Court is being asked to "resolve . . . a real controversy with real impact on real persons." *TransUnion LLC*, 594 U.S. at 424 (citation and internal quotation marks omitted). Without addressing this dispute's underlying merits—which cannot be done at this stage of the proceedings—that "real controversy" is whether the insurance proceeds from Mr. Mechling's death that went to the putative policyholder should go to the Estate instead. As a court in the District of Minnesota recently held: "Plaintiffs are not suing merely to ensure compliance with regulatory law; instead, they seek to recover from Defendants the proceeds of [allegedly] illegal wagers on the Insured[ ]'s li[fe] based on an alleged STOLI scheme in which Defendants were a party." *Estate of Ann Boggess*, 2024 WL 100839, at *5. Similarly, a number of other recent federal court rulings have reached the same conclusion. *See, e.g.*, *Estate of Berland v. Lavastone Cap.*, Civ. No. 18-2002, 2022 WL 15023450 (D. Del. Sept. 28, 2022) (holding that, under Delaware law, the proceeds of a $5 million STOLI policy should go to the insured's estate); *Estate of Malkin v. Wells Fargo Bank, N.A.*, Civ. No. 19-14689, 2022 WL

2285884 (11th Cir. June 23, 2022) (affirming the district court's ruling allowing the estate to

recover the proceeds of a STOLI policy); *Estate of Hoefer v. ATC Realty Fifteen, Inc.*, No. 20-

cv-6698-JSC, 2021 WL 148087 (N.D. Cal. Jan. 15, 2021) (denying defendant's motion to

dismiss and allowing the estate to proceed on its insurable interest claim under Delaware law).

Additionally, as noted by the Estate, there are several pre-*Erie* Supreme Court decisions

that allowed the estates of insureds to recover death benefits, where the policies had been owned

by an entity without and insurable interest. *See Commack v. Lewis*, 82 U.S. 643 (1872) (finding

that a $3,000 policy taken out to secure a $70 debt was "a sheer wagering policy" and allowing

the insured's estate to recover the policy's proceeds); *Warnock v. Davis*, 104 U.S. 775 (1881)

(holding that the assignment of an insurance policy to an investor with no insurable interest was

void and that equitable title therefore belonged to the insured's estate).

A survey of Wisconsin case law suggests a similar tradition. *See Albrent v. Spencer*, 81

N.W.2d 555, 560 (Wis. 1957) ("[A]n assignment of a life insurance policy to one not having an

insurable interest, is not of itself invalid, but . . . if made for cloaking an agreement whereby the

assignee is to engage in a gamble upon the life of the insured, it is invalid."); *Solberg v.

Metropolitan Life Ins. Co.*, 185 N.W.2d 319, 323 (Wis. 1971) ("Under Wisconsin law, claimants

to proceeds of life insurance policies may establish facts sufficient to prove equitable entitlement

to the proceeds even if the written terms of the policy, along with written designations of

beneficiaries, unambiguously indicate that the proceeds are payable to another.") (citing

*American Casualty Co. v. M.S.L. Industries, Inc., Howard Industries Division*, 406 F.2d 1219

(7th Cir. 1969)); *Modern Woodmen of America v. Barber*, 227 N.W. 268 (Wis. 1929)); *Bauer v.

Bauer*, No. 80-498, 1980 WL 99472, at *1 (Wis. Ct. App. Nov. 21, 1980) (affirming the trial

court's imposition of a constructive trust to transfer the proceeds of a life insurance policy from the insured's ex-wife to his children based on the value of the policies at the time of the divorce).

Defendants' argument to the contrary conflates the issue of standing with a determination on the merits. But the viability of the Estate's claim as a matter of law is for another day. For now, the Estate's allegations suffice to establish Article III standing, and confer this Court's jurisdiction over these claims, ones allegedly asserted to recover proceeds from life insurance policies lacking an insurable interest.

Accordingly, Defendants' motion to dismiss on standing grounds will be denied.

### C.  Personal Jurisdiction

The Estate argues that it has personal jurisdiction over US Bank because US Bank has engaged in business in Connecticut through its transactions with PHL, a Connecticut corporation. Opp'n to US Bank Mot. at 15. The Estate has not alleged any direct business transacted by FCI Cayman in Connecticut. Rather, it alleges that, US Bank's contacts with Connecticut are attributable to FCI Cayman because, as securities intermediary, US Bank acted as FCI Cayman's agent. Opp'n to FCI Cayman Mot. at 38.

The Court will first address the question of whether it has personal jurisdiction over US Bank. If so, the Court will proceed to analyze whether it is proper to extend this personal jurisdiction to FCI Cayman.

### a.  US Bank

In a diversity action, the amenability of a foreign defendant to suit in federal court is determined in accordance with the law of the state where the court sits, so we apply Connecticut law to this case. *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir. 1963). In Connecticut, "a trial court may exercise jurisdiction over a foreign defendant only if the

defendant's intrastate activities meet the requirements both of [the state's long-arm] statute and of the due process clause of the federal constitution." *Thomason v. Chem. Bank*, 661 A.2d 595, 598 (Conn. 1995); *see also Licci ex rel. Licci*, 732 F.3d at 168. The Court will address the question of whether it would offend due process to assert jurisdiction only after determining that jurisdiction is statutorily permissible. *See Lombard Bros., Inc. v. Gen. Asset Mgmt. Co.*, 460 A.2d 481, 483–84 (Conn. 1983); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007).

### i. Connecticut Law

The Connecticut long-arm statute applicable to this case[3] states that, "[a]s to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident individual, foreign partnership or foreign voluntary association . . . who in person or through an agent: . . . [t]ransacts any business within the state." Conn. Gen. Stat. § 52-59b(a).

The phrase "transacts any business" is interpreted broadly. *Hamann v. Carpenter*, No. 3:16-CV-501 (VAB), 2017 WL 421646, at *5 (D. Conn. Jan. 31, 2017). When determining whether an out-of-state defendant has transacted business in Connecticut, courts consider:

> (1) whether the defendant has an on-going contractual relationship with a Connecticut corporation; (2) whether the contract was negotiated or executed in Connecticut and whether, after executing the contract, the defendant visited Connecticut for the purpose of meeting with parties to the contract regarding the relationship; (3) the choice-of-law clause of any such contract; and (4) whether the contract requires franchisees to send

---

[3] Conn. Gen. Stat. §§ 33-929(e) and (f) contain provisions governing personal jurisdiction over foreign corporations. As noted by the Estate in its Response to US Bank's motion to dismiss, *see* Opp'n to US Bank Mot. at 17–18, both § 52-59b(a) and § 33-929(e) contain the phrase "transact business." Connecticut courts have interpreted the phrase differently, however, in these different contexts. Under § 52-59b(a), "transacts any business" is interpreted broadly. *See Hamann v. Carpenter*, No. 3:16-CV-501 (VAB), 2017 WL 421646, at *5 (D. Conn. Jan. 31, 2017). In contrast, in the § 33-929(e) context, the phrase is "not broadly interpreted[.]" *Goudis v. Am. Currency Trading Corp.*, 233 F. Supp. 2d 330, 334–35 (D. Conn. 2002), quoting *Chemical Trading, Inc. v. Manufacture de Produits Chimiques de Tournan*, 870 F. Supp. 21, 23 (D. Conn. 1994).

notices and payments into the forum state or subjects them to supervision by the
corporation in the forum state.

*Vertrue Inc. v. Meshkin*, 429 F. Supp. 2d 479, 490 (D. Conn. 2006), quoting *Agency Rent A Car*

*Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996).

"In determining whether the plaintiffs' cause of action arose from the defendants'

transaction of business within [Connecticut], Connecticut courts do not resort to a rigid formula,

but rather . . . balance considerations of public policy, common sense, and the chronology and

geography of the relevant factors." *MacDermid, Inc. v. Canciani*, 525 Fed. App'x 8, 10 (2d Cir.

2013) (internal quotation marks omitted) (citing *Zartolas v. Nisenfeld*, 440 A.2d 179, 181 (Conn.

1981)). None of these factors is dispositive, and a "single purposeful business transaction" may

give rise to personal jurisdiction. *Zartolas*, 184 Conn. at 474.

US Bank argues that any exercise of personal jurisdiction by this Court is improper under

the long-arm statute because the "Estate's causes of action do not arise from any business U.S.

Bank allegedly transacted in Connecticut." US Bank Mem. at 15, citing *Hamann*, 2017 WL

421646, at *5. More specifically, the Estate's claims allegedly arise out of the circumstances

under which the Policies were purchased by Oceanus, transactions that occurred many years

before US Bank began to serve as securities intermediary for FCI Cayman. *Id.* US Bank claims

that the wire transfers, phone calls, and claim for death benefits made to PHL, a Connecticut

entity, do not constitute "the sort of continuous or persistent course of conduct necessary to find

personal jurisdiction consistent with applicable precedent." *Id.*

The Estate argues that the phrase "transacts any business" should be construed broadly

and that courts do not resort to a rigid formula when making this type of determination. Opp'n to

US Bank Mot. at 17–18. It argues that the requirements of § 52-59b(a) are satisfied here because

US Bank transacted business in Connecticut in several ways related to this case, including

owning the Policies, sending annual premium payments to PHL, submitting a claim for death benefits to PHL, and accepting those death benefits. *Id.* at 18. The Estate further argues that US Bank transacted business in Connecticut by filing and litigating a lawsuit against PHL regarding these very Policies in the District of Connecticut in 2014. *See U.S. Bank Nat'l Assoc., as securities intermediary for Lima Acquisition LP v. PHL Variable Ins. Co.*, No. 3:14-CV-01398 (WWE), 2014 WL 10013183 (D. Conn. Oct. 16, 2014). The Estate alleges that, as part of that lawsuit, US Bank asserted claims under Connecticut state law. Second Am. Compl. ¶ 61 ("In addition to claims for breach of contract, U.S. Bank asserted claims under Connecticut's Unfair Trade Practices Act.").

US Bank replies that its relationship with PHL cannot suffice to establish personal jurisdiction in this case, since PHL is not a party. *See* US Bank Reply, at 4 ("[T]he extent of U.S. Bank's in-state contacts with PHL are irrelevant because the Estate's claims do not arise out of or relate to those contacts.") (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Similarly, it argues that the 2014 lawsuit "challenged PHL's practice of imposing increases in cost of insurance ('COI') rates across a portfolio of over 100 life insurance policies" (including the two Policies at issue in this case), and that it therefore "had nothing to do with whether the underlying policies were validly issued or supported by insurable interest." US Bank Reply at 4.

The Court disagrees.

As a preliminary matter, both cases cited by US Bank are inapposite. In *Hamann*, this Court lacked personal jurisdiction over the defendant under Connecticut's long-arm statute because the alleged tort had not arisen out of the Defendant's alleged transaction of business in the State. 2017 WL 421646, at *5. In *Bristol-Myers*, the Supreme Court—analyzing the due

process element of personal jurisdiction, not Connecticut's long-arm statute—held that a defendant's decision to contract with a resident third-party to distribute a product nationally did not provide a sufficient basis for personal jurisdiction, in the absence of any alleged relevant acts with that third-party in the forum state. *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 582 U.S. 255, 268 (2017). Put more succinctly, "a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction[.]" *Walden v. Fiore*, 571 U.S. 277, 286 (2014).

Here, the Estate has alleged that US Bank has, for over a decade, engaged in an ongoing business relationship, entailing mutual obligations, with a Connecticut entity, PHL. As part of this relationship, US Bank has paid yearly insurance premiums and collected death benefits resulting from the Policies. On this basis, the Estate has alleged facts sufficient to meet both requirements of Conn. Gen. Stat. § 52-59b(a): (1) US Bank has transacted business in Connecticut, and (2) the claims at issue in this suit arose from that business. *Cf Teleco Oilfield Servs., Inc. v. Skandia Ins. Co., Ltd.*, 656 F. Supp 753 (D. Conn. 1987) (finding that, even under the more restrictive corporate long-arm statute, the payment of insurance premiums from Connecticut constituted actual and substantial performance of the terms of a contract with a foreign defendant sufficient to establish personal jurisdiction).

Moreover, US Bank previously initiated a lawsuit in the District of Connecticut regarding the very policies at issue in this case. Although US Bank argues that the prior lawsuit involved entirely separate claims and is not comparable to this suit because PHL is not a party here, this alleged distinction is not enough of a difference to insulate US Bank from suit in Connecticut courts. Given that US Bank has used Connecticut courts as a venue to initiate litigation regarding the Policies, and indeed has invoked Connecticut state law to protect its own interests in the

Policies, it cannot now avoid litigation regarding the Policies by arguing that Connecticut courts

lack jurisdiction over it.[4] As a result, "considerations of public policy [and] common sense,"

weigh in favor of personal jurisdiction here. *MacDermid, Inc.*, 525 Fed. App'x at 10; *see also*

*Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (holding that the determination of whether

---

[4] It has long been established that a plaintiff who brings a suit has willingly submitted itself to the jurisdiction of the court and therefore waives any objections to a defendant's counterclaims. *See, e.g.*, *Grupke v. Linda Lori Sportswear*, 174 F.R.D. 15, 17 (E.D.N.Y. 1997) ("In the vast majority of cases a plaintiff, by virtue of bringing suit, waives venue and personal jurisdiction objections to a defendant's counterclaims."); *Adam v. Saenger*, 303 U.S. 59, 67–68 (1938) ("The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes for which justice to the defendant requires his presence. It is the price which the state may exact as the condition of opening its courts to the plaintiff."); *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451 (1932) (holding that a plaintiff "submit[s] itself to the jurisdiction of the court with respect to all the issues embraced in the suit, including those pertaining to the counterclaim of the defendants.").

The First Circuit has extended this line of reasoning, applying consent jurisdiction to other lawsuits in a given forum that arise out of the same transaction or occurrence. *See General Contracting & Trading Co., LLC v. Interpole, Inc.*, 940 F.2d 20, 23 (1st Cir. 1991) (holding that it "would produce an unjust symmetry" to allow a party "to enjoy the full benefits of access to a state's courts *qua* plaintiff, while nonetheless retaining immunity from the courts' authority *qua* defendant") (citing *Adam*, 303 U.S. at 67–68); *Marron v. Whitney Group*, 662 F. Supp. 2d 198, 200 (D. Mass. 2009) ("A defendant who purposely avails himself of a particular forum state's courts by initiating a lawsuit there impliedly submits to that forum's jurisdiction with regard to all actions arising from the same nucleus of operative facts, or sharing the same transactional core."). The First Circuit thus adopted an "affirmative relief rule, specifying that personal jurisdiction exists where a defendant also independently seeks affirmative relief in a separate action before the same court concerning the same transaction or occurrence." *Dow Chemical v. Calderon*, 422 F.3d 827, 834 (9th Cir. 2005).

The Second Circuit has not yet decided whether to adopt *Interpole*'s holding. *V&A Collection, LLC v. Guzzini Properties, Ltd.*, 46 F.4th 127, 132–33 (2d Cir. 2022) (finding that *Interpol*'s logic did not apply because the case involved two lawsuits arising out of different transactions). Yet, other courts around the country have accepted *Interpol*'s reasoning. *See, e.g.*, *Larson v. Galliher*, No. 2:06-CV-1471-RCJ-GWF, at *2 (D. Nev. Jan. 5, 2007) (holding that "[i]t would be unfair to allow [the defendant] to utilize Nevada state courts as a plaintiff in his dispute with [the defendant] and then grant him immunity from having to defend any suits in the forum" and concluding that the defendant "has impliedly consented to the jurisdiction of [the Nevada district court] through filing his earlier [] action in Nevada court"); *Capriotti's Sandwich Shop, Inc. v. Taylor Family Holdings, Inc.*, 857 F. Supp. 2d 489, 501 (D. Del. 2012) (holding that, by filing suit in the Delaware Court of Chancery, a nonresident franchisee and its president had waived jurisdictional defenses and consented to the jurisdiction of all Delaware courts, including federal district court, and therefore could not claim lack of personal jurisdiction in a suit brought by the franchisor for breach of the franchise agreement). Significantly, some of these courts have found consent jurisdiction even where the second lawsuit involved a non-party to the original action. *See, e.g.*, *Auto-Owners Ins. Co. v. G&D Construction Group, Inc.*, 588 F. Supp. 3d 1328, 1333–34 (N.D. Ga. 2022) (holding that an out-of-state defendant had waived its right to contest personal jurisdiction in federal district court in Georgia because it had previously brought suit against its co-defendant in Georgia state court on claims arising out of the same nucleus of operative fact); *Praetorian Specialty Ins. Co. v. Auguillard Const. Co., Inc.*, 829 F. Supp. 2d 456, 460 (W.D. La. 2010) (the Louisiana district court held that it had personal jurisdiction over out-of-state defendants in a declaratory judgment action that was related to the lawsuit those out-of-state defendants had filed in Louisiana state court, even though the declaratory judgment action was filed by a non-party to the state-court suit).

personal jurisdiction has been established in a given case "will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.").

*ii.   Due Process Clause*

Because the Court has determined that it has personal jurisdiction over US Bank under Connecticut's long-arm statute, it now must determine whether the exercise of personal jurisdiction over US Bank is consistent with due process under the U.S. Constitution. *Licci ex rel. Licci*, 732 F.3d at 169. "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp.*, 471 U.S. at 471–72, quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945). Due process demands that the defendant over whom a court seeks to exercise jurisdiction must have "minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316. Thus, "[t]he primary focus of [the] personal jurisdiction inquiry is the defendant's relationship to the forum State." *Bristol-Myers Squibb Co.*, 582 U.S. at 262.

There are two types of personal jurisdiction: general jurisdiction and specific jurisdiction. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). General jurisdiction over an entity exists where the individual or corporation is fairly regarded as "at home." *Id.* at 924. "A court with general jurisdiction may hear any claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-Myers*, 582 U.S. at 262. Specific jurisdiction arises where the specific suit arises out of or relates to the

defendant's contacts with the forum State. *Id.*; *Burger King Corp.*, 471 U.S. at 472–73. In order for specific jurisdiction to exist, there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919.

The Estate has not alleged general jurisdiction over either Defendant. The Court thus will focus the issue of specific jurisdiction.

In order to establish specific jurisdiction, a plaintiff must first demonstrate that the defendant has the requisite minimum contacts with the forum State—that is, that the defendant has "purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci ex rel. Licci*, 732 F.3d at 170 (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)). The contact must arise out of the defendant's own actions, rather than from the "unilateral activity of another party or a third person[.]" *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984); *Walden*, 571 U.S. at 284. And they may not be "random, isolated, or fortuitous." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984). A defendant may purposefully avail itself of a form, however, if it directs its agents or distributors to take action there. *Charles Schwab v. Bank of America Corp.*, 883 F.3d 68, 85–86 (2d Cir. 2018).

In order to establish personal jurisdiction, a given suit must arise out of the out-of-state defendant's minimum contacts; in other words, there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Bristol-Myers*, 582 U.S. at 262 (quoting *Goodyear*, 564 U.S. at 919). The Supreme Court has emphasized: "None of our precedents has suggested that only a strict causal relationship between the defendant's in-state

activity and the litigation will do. As just noted, our most common formulation of the rule demands that the suit "arise out of or relate to the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Judicial District Ct.*, 141 S. Ct. 1017, 1026 (2021) (quoting *Bristol-Myers*, 582 U.S. at 262).

Then, once both minimum contacts and a nexus between the controversy and the forum state have been established, a court must weigh "these contacts . . . in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Burger King Corp.*, 471 U.S. at 476 (internal quotation marks omitted). The Second Circuit has held that relevant factors in making this determination include "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; [and] (3) the plaintiff's interest in obtaining convenient and effective relief . . . ." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).

In the contract context, the Supreme Court has held that parties who "'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King.*, 471 U.S. at 473 (quoting *Travelers Health Assn. v. Virginia*, 339 U.S. 643, 647 (1950)). Yet, an individual's contract with an out-of-state party alone cannot automatically establish sufficient minimum contacts in the other party's home forum. *Burger King*, 471 U.S. at 480. Warning against the use of "mechanical tests" the Supreme Court has instead urged courts to take a "highly realistic approach" that focuses on a range of factors, including "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* at 479. Finally, the Court has weighed heavily the extent to

which the defendant knew he was affiliating himself with an out-of-state entity, and whether the defendant had any reason to anticipate being sued in that state. *Id.* at 480.

US Bank argues that: (1) the Estate "has not met its burden to show that U.S. Bank 'purposefully avail[ed]' [it]self of the privilege of conducting activities" within Connecticut; (2) that the Estate's claim "does not directly arise out of or relate to any activity by U.S. Bank directed toward Connecticut"; and (3) that the exercise of jurisdiction would be unreasonable. US Bank Mem. at 17–18. It further argues that its lawsuit against PHL in 2014 is "irrelevant" to personal jurisdiction in this case because this suit is "an action by an entirely different party to recover death benefits paid out under life insurance policies based upon allegations that the policies were illegally procured at inception." *Id.* at 18.

The Estate responds that US Bank has purposefully availed itself of the privilege of conducting activities in Connecticut by: (1) initiating a lawsuit in the District of Connecticut in 2014 to protect its interest in these Policies, (2) maintaining a decade-long relationship with PHL (including its payment of annual premiums and receipt of $10 million in death benefits), and (3) knowingly engaging in activity that could subject it to litigation in the state (the Estate asserts that "insurance companies frequently bring declaratory-judgment actions in their home forums against policyholders when there are reasons to doubt a policy's validity."). Opp'n to US Bank Mot. at 14–17. The Estate further argues that under *Ford*, there need not be a strict causal relationship between US Bank's contacts with Connecticut and the claims raised here. *Id.* at 17 (citing *Ford Motor Co.*, 141 S. Ct. at 1026). It notes that, "a claim arises out of forum contacts when defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum." *U.S. Bank Nat'l Assoc. v. Bank of America N.A.*, 916 F.3d 143, 151 (2d Cir.

2019). Finally, the Estate argues that US Bank has not identified any reasons why the Court's exercise of jurisdiction would be unreasonable. Opp'n to US Bank Mot. at 19.

US Bank replies that this suit does not arise out of its limited contacts with the forum state because the Estate is challenging the alleged unlawful procurement of the Policies under Wisconsin law, which US Bank asserts has "no relationship" to its payment of premiums and collection of death benefits years later. US Bank Reply at 2. Similarly, US Bank argues that, under *Bristol-Myers*, its contacts with PHL, which is not a party to this case, cannot give rise to jurisdiction. 582 U.S. at 264–65 ("[A] defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction.").

The Court disagrees.

First, the Estate has alleged facts sufficient to establish the required minimum contacts between US Bank and Connecticut. The Estate has claimed that US Bank paid annual insurance premiums to PHL for a decade, and that it collected over $10 million in death benefits from PHL after Mr. Mechling's passing. It further asserts that US Bank utilized the Connecticut court system to protect its rights in the very Policies at the heart of this lawsuit. Taken together, these actions constitute a deliberate contact for the purposes of due process analysis; US Bank deliberately entered into an ongoing contractual relationship with PHL, which entailed a series of ongoing transactions that cannot be considered "random," "fortuitous," or "attenuated." *See Burger King*, 471 U.S. at 479–80 (the "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' fortuitous,' or 'attenuated' contacts"); *Hanson*, 357 U.S. at 253 ("[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.").

Second, this case arises out of US Bank's contacts with the forum state. US Bank argues that the Court should distinguish between: (1) the allegedly improper procurement of the Policies and (2) any of the activities that US Bank engaged in, in order to maintain and protect its interests in the Policies. But this is another distinction without a sufficiently meaningful difference. If, as the Estate alleges, the Policies were procured illegally, then US Bank's activities to maintain and protect its interest in these same Policies, and secure the death benefits thereunder, are related. This does not, of course, mean that US Bank bears any liability for the claims alleged here. But the question of liability is not the relevant question now. Rather, the Court must ask whether this lawsuit arises out of or relates to US Bank's contacts with PHL regarding the Policies. It does.

As described above, in order to confer personal jurisdiction, a case must arise from the contacts of the defendant with the forum state—but this relationship need not be strictly causal. *Ford Motor Co.*, 141 S. Ct. at 1026 (quoting *Bristol-Myers*, 582 U.S. at 262). Under this standard, US Bank's repeated argument—that "the extent of [its] in-state contacts with PHL are irrelevant because the Estate's claims do not arise out of or relate to those contacts"—is unpersuasive. Although US Bank argues that its contacts in Connecticut are not any different from those required to maintain "a traditional life insurance policy arrangement," *see* US Bank Reply at 2, the Court cannot conclude that they "have no relationship to . . . the basis of the Estate's claims." *Id.* In fact, US Bank's contacts with PHL were essential to maintaining the Policies and securing the death benefits, which are at the center of this lawsuit. As a result, the nexus between US Bank's contacts with Connecticut and the controversy are sufficient to weigh in favor of personal jurisdiction. *See Marron*, 662 F. Supp. 2d at 200 ("A defendant who purposely avails himself of a particular forum state's courts by initiating a lawsuit there

impliedly submits to that forum's jurisdiction with regard to all actions arising from the same nucleus of operative facts, or sharing the same transactional core."); *Auto-Owners Ins. Co.*, 588 F. Supp. 3d at 1333–34 (holding that an out-of-state contracting company had waived its right to contest personal jurisdiction in a declaratory judgment action brought by an insurance company in Georgia district court because it had previously brought suit against its co-defendant, a resident construction company, in Georgia state court on claims arising out of the same installation issues at issue in the declaratory judgment action); *Praetorian Specialty Ins. Co.*, 829 F. Supp. 2d at 460 (holding that out-of-state individuals who sued an alleged tortfeasor in Louisiana state court could not contest personal jurisdiction when sued by an insurance company in a declaratory judgment action in Louisiana district court).

Finally, and most importantly, the Court must consider holistically whether the exercise of personal jurisdiction would be reasonable. As a preliminary matter, the Supreme Court has held that, where a defendant has created continuing obligations between it and a resident of the forum state, "it is presumptively not unreasonable to require [the defendant] to submit to the burdens of litigation in that forum as well." *Burger King Corp.*, 471 U.S. at 476. Much of the calculus also turns on whether the defendant had notice or warning that it might be subject to suit in the forum state. Courts are instructed to ask whether the "defendant's conduct and connections with the forum state are such that [it] should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Put differently, did the defendant have "fair warning" or "clear notice" that it would be subject to jurisdiction in the state's courts? *Burger King*, 471 U.S., at 472 ("Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of

the forum . . . and the litigation results from alleged injuries that 'arise out of or relate to' those

activities . . . .") (internal citations omitted); *Ford Motor Co.*, 141 S. Ct., at 1030 (defining "fair

warning" as knowledge that a particular activity may subject it to the jurisdiction of a foreign

sovereign, such that a defendant can structure its primary conduct to lessen or avoid exposure to

a given state's courts). As discussed above, given US Bank's decision to bring litigation in

Connecticut courts regarding these Policies, it cannot now claim that it is burdened by defending

against a suit regarding these same Policies in a Connecticut court now.

Accordingly, the Court concludes exercising personal jurisdiction over US Bank does not

violate the due process protections of the Constitution.

> b.  <u>FCI Cayman</u>

The Estate advances two arguments as to why it has personal jurisdiction over FCI

Cayman. First, it alleges that, as FCI Cayman's securities intermediary, "U.S. Bank acted on

behalf of, at the direction of, and for the benefit of FCI Cayman with respect to the Policies, and

was FCI Cayman's agent with respect to the Policies." Second Am. Compl. ¶ 58. As a result, the

Estate claims that "U.S. Bank's contacts with Connecticut are attributable to FCI Cayman for

purposes of specific jurisdiction." *Id.* ¶ 10 (citing *Charles Schwab Corp.*, 883 F.3d at 84).

Second, the Estate argues that Apollo Global Management has provided management services,

directly or indirectly, to FCI Cayman since 2017, and that its affiliate, Apollo Management

Holdings, L.P. has been based in Greenwich, Connecticut since at least 2010. Second Am.

Compl. ¶¶ 6–8.

Both of these allegations rely on the agency theory of personal jurisdiction. "It is well

established that a defendant can 'purposefully avail itself of a forum by directing its agents or

distributors to take action there.'" *Charles Schwab Corp.*, 883 F.3d at 84–85, quoting *Daimler*

*AG v. Bauman*, 571 U.S. at 134–35. More specifically, the agency relationship may be sufficient to impute the contacts of the agent to the principal for the purposes of establishing personal jurisdiction. *Id.* at 85–86 (finding it "plausible" that "an agency relationship between a parent corporation and a subsidiary that sells securities on the parent's behalf could establish personal jurisdiction over the parent in a state in which the parent 'indirectly' sells the securities"). The Second Circuit has cautioned, however, that "sparse allegations of agency . . . are too conclusory to make a *prima facie* showing of personal jurisdiction." *Id.* at 86. In *Charles Schwab*, the court found insufficient a complaint that included merely a list of transactions between the defendants and the purported agents, as well as conclusory statements about the control exerted over the alleged agents and financial benefit derived from the alleged agents. *Id.* (holding that, because the complaint merely "set[] forth a non-exhaustive list of the broker-dealer entities from which it purchased debt instruments, it shed[] no light on the relationship between Defendants and those broker-dealers" and therefore "[did] not allow [the court] to determine whether any particular broker-dealer's contacts should be imputed to any particular Defendant")

FCI Cayman argues that the Estate has merely asserted conclusory allegations regarding its relationship with US Bank, which are insufficient to establish personal jurisdiction under *Charles Schwab.* It further argues "there is no suit-related connection between Cayman and Connecticut," and that this Court's exercise of jurisdiction would violate the Due Process Clause. FCI Cayman emphasizes that the claims in this suit arise from the alleged illegal procurement of the Policies in 2007, which predated US Bank's alleged involvement by at least four years and FCI Cayman's involvement by at least a decade. FCI Cayman Mem. at 21. Finally, with regard to Apollo, FCI Cayman argues that the Complaint "fails to allege how or why [Apollo Management Holdings'] alleged contacts with Connecticut could be imputed to Cayman." *Id.* at

22 n.8. It also disputes the veracity of the Estate's allegation that Apollo Management Holdings

has been based in Connecticut since 2010. *Id.*

The Estate responds that a securities intermediary, by definition, acts for the benefit of

and at the direction of its customer—and therefore, it is the customer's agent. Opp'n to US Bank

Mot. at 39. The Estate argues that other courts have held that general principles of agency law

apply to securities intermediaries acting on behalf of the beneficial owner of a STOLI policy. *Id.*

at 40 (citing *Malkin*, 478 A.3d at 67). Finally, the Estate notes that in a recent STOLI case in the

U.S. District Court for the District of Minnesota, US Bank and Wells Fargo were sued as

security intermediaries for a number of beneficial owners, including FCI Cayman. *Id.* at 41–42.

In that case, it claims, US Bank argued that it should be immunized from liability because in its

role as securities intermediary it acted as a mere agent. *Id.* Taken together, the Estate argues that

these allegations are sufficient to impute US Bank's contacts with Connecticut to FCI Cayman,

thereby establishing personal jurisdiction.

The Court agrees.

In the personal jurisdiction context, "[d]etermining whether individuals acted as agents of

the Defendants requires an analysis of the realities of the relationship in question rather than the

formalities of agency law." *Securities Investor Protection Corp. v. Bernard L. Madoff Investment

Securities LLC*, 650 B.R. 5, 17 (Bankr. S.D.N.Y. 2023) (internal quotation marks omitted)

(quoting *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, No. 18 Civ. 8152 (JFK),

2021 WL 2000371, at *7 (S.D.N.Y. May 19, 2021)). Plaintiffs generally must allege facts which

demonstrate that the agent acted for the benefit of, and with the knowledge and consent of, the

nonresident principal, and that the principal actually exercised some control over the alleged

agent. *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 318–19 (S.D.N.Y.

2009) (holding that the complaint was sufficient to establish an agency relationship for purposes of personal jurisdiction because it alleged: (1) that the out-of-state principal benefited from its alleged in-state agent's actions and contracts by receiving some or all of the sale price; and (2) that both the principal and agent were owned and controlled by the same individual, and that the same individuals exercised control over both entities).

The Estate has alleged that US Bank served as securities intermediary to FCI Cayman. Under Connecticut law, a securities intermediary is defined as "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity." Conn. Gen. Stat. § 42a-8-102(a)(13)(B). More specifically, the Estate alleges that, on FCI Cayman's behalf, US Bank paid premiums to PHL, corresponded with PHL about the Policies, and collected the death benefits from PHL. The Estate has also alleged that, on behalf of FCI Cayman, US Bank procured Mr. Mechling's medical records and contacted Mr. Mechling and his family members to check on the status of his health. Second Am. Compl. ¶¶ 38–40. And, as noted by the Estate, in US Bank's first motion to dismiss, it states: "As is typical for securities intermediaries, U.S. Bank acted as a conduit on behalf of its client, the beneficial owner of the Policies, and credited the client's account with the death benefits in the same way as when a person buys or sells stock and holds the stock in the name of its broker." ECF No. 25, at 6 n.1 (Feb. 8, 2023).

Based on the descriptions of US Bank's role from both the Estate and US Bank itself, the Court finds that the Estate has pled facts sufficient to establish that, in practice, US Bank acted, at FCI Cayman's direction, to maintain the Policies for the benefit of, and with the consent and knowledge of, FCI Cayman.

Accordingly, the Court holds that US Bank's contacts with Connecticut may be imputed to FCI Cayman for the purpose of establishing personal jurisdiction.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are **DENIED**.

**SO ORDERED** at New Haven, Connecticut, this 2nd day of February, 2024.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE