# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

---

ESTATE OF RUSSEL MECHLING,
     *Plaintiff*,

    v.

U.S. BANK NATIONAL ASSOCIATION
AND FINANCIAL CREDIT INVESTMENT
III SPV-A (CAYMAN), L.P.,
     *Defendants*.

No. 3:23-cv-25 (VAB)

---

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

The Estate of Russell Mechling ("the Estate" or "Plaintiff"), by its Executor Ellen Ulmer, has sued U.S. Bank National Association ("US Bank") and Financial Credit Investment III SPV-A (Cayman), L.P. ("Cayman") (collectively, "Defendants") under Wisconsin law to recover death benefits received by Defendants for two $5 million alleged stranger-originated life-insurance ("STOLI") policies taken out on Mr. Mechling's life.[1] *See* Second Amended Complaint, ECF No. 106 (Sept. 6, 2023) ("SAC").

Each of the parties have filed cross-motions for summary judgment. Estate Mot. for Summ. J., ECF No. 220 (Feb. 14, 2025); US Bank Mot. for Summ. J., ECF No. 224 (Feb. 14, 2025); Cayman Motion for Summ. J., ECF No. 229 (Feb. 14, 2025).

For the following reasons, the Estate's motion for summary judgment, ECF No. 220, is **DENIED**.

U.S. Bank's and Cayman's motions for summary judgment, ECF Nos. 224 and 229, are **GRANTED**.

---

[1] The Estate has withdrawn its claim for unjust enrichment. *See* Not. re Pl.'s Withdrawal of Count 2, ECF No. 242 (Apr. 18, 2025).

# I.    FACTUAL AND PROCEDURAL BACKGROUND

## A.  Factual Background

This case concerns life insurance policies taken out on Mr. Mechling's life that the Estate

contends are STOLI policies. As noted by the Second Circuit:

> A STOLI policy is one obtained by the insured for the purpose of
> resale to an investor with no insurable interest in the life of the
> insured—essentially, it is a bet on a stranger's life. Notably, every
> relevant state's law provides that, after a life insurance policy has
> been issued, an insured may resell that policy to an investor, who
> would become the policy's beneficiary and assume payment of the
> premiums. Thus, with respect to transferability, the difference
> between non-STOLI and STOLI policies is simply one of timing
> and certainty; whereas a non-STOLI policy might someday be
> resold to an investor, a STOLI policy is intended for resale from
> before its issuance. While life insurers are required by law to permit
> resale of policies originally obtained for estate planning purposes,
> they are not obligated to issue policies intended for resale from the
> outset.
>
> STOLI policies became a popular investment in the mid 2000s for
> hedge funds and others eager to bet that the value of a policy's death
> benefits would exceed the value of the required premium payments.

*United States v. Binday*, 804 F.3d 558, 565 (2d Cir. 2015), *abrogated on other grounds by*

*Ciminelli v. United States*, 598 U.S. 306 (2023).

Oceanus LLC ("Oceanus") "was a Wisconsin LLC formed in October 2006." Plaintiff's L.

R. 56(a)(1) Statement, ECF No. 221 (redacted); ECF No. 225 (sealed) ¶ 8 ("Estate SMF").[2]

In March 2007, Oceanus engaged a Wisconsin law firm, DeWitt Ross & Stevens

("DeWitt"), to advise on a program to purchase options for life insurance policies (the "Oceanus

---

[2] The parties dispute whether Oceanus was "based in" Wisconsin. The Estate claims that it was based in Madison, Wisconsin. *See* Estate SMF at ¶ 8. Cayman argues that certain individuals associated with the Oceanus who performed work on the Policies were located in Irvine, California. *See* Cayman L. R. 56(a)(2) Statement of Facts in Opp' n to Pl. Mot. for Summ. J., ECF No. 249-1 at 5 ("Cayman Opp'n SMF") ("Per signature lines on emails, some of which are exhibits to the Estate's [Statement of Material Facts], all of these individuals and others associated with the Oceanus program, including Salon, Ames, and Tange, worked from Irvine, California (not Wisconsin)."); *id*. at 42–43.

Program"). Estate SMF ¶ 8–9. Under this program, Oceanus allegedly sought to "purchase options . . . related to the purchase of large life insurance policies (i.e. life insurance policies with death benefits of $1,000,000 or more . . .)" with each option to be "purchased from an irrevocable trust (the 'Insurance Trust') established for the benefit of the Insured's spouse and/or children and more remote lineal descendants." Ex. 4 to Estate's SMF, ECF No. 221-2 at 1.[3] This trust would then create a sub-trust to hold each policy, with the beneficial interest in the sub-trust to be held by the Insurance Trust. Oceanus then would purchase options to buy the Insurance Trust's beneficial interest in the sub-trusts holding the policies. *Id.* "Once the Option has been granted to Oceanus, the Insurance Trust will not be able to transfer the Beneficial Interests in the Sub-Trusts . . . except as expressly permitted by Oceanus." *Id.*

In 2007, Mr. Mechling, with the assistance of advisors such as his accountant, took out two life insurance policies (the "Policies") after learning of the Oceanus Program.[4] Cayman's L. R. 56(a)(1) Statement, ECF No. 229-2 (redacted); ECF No. 231-1 (sealed) ¶ 11 ("Cayman SMF"); Pl. SMF ¶ 17, 23. Each policy was in the amount of $5 million and were issued by a Connecticut-based insurance company, PHL Variable Insurance Co. ("PHL"). Cayman SMF ¶ 13, 19; Estate SMF ¶ 17.

---

[3] While Cayman objects to this document as "inadmissible hearsay," *see* Cayman Opp'n SMF at 6, this document likely is admissible under the business records exception. Fed. R. Evid. 803(6); *see also Wells Fargo Bank, N.A. v. Est. of Gold*, No. 22-CV-6114 (BMC), 2025 WL 1808671, at *3 (E.D.N.Y. July 1, 2025) (considering similar documents as business records, and noting "[d]ocuments may be admitted as business records under Rule 803(6), even though they are not the business records of one of the parties." (citing *In re Blech Sec. Litig.*, No. 94-cv-7696, 2003 WL 1610775, at *5 (S.D.N.Y. March 26, 2003)).

[4] The Estate argues that Mr. Mechling was identified as a "good fit" for the Oceanus program, Estate SMF ¶ 16. Cayman alleges that Mr. Mechling sent an April 24, 2007 letter asking Oceanus about life insurance policies, Cayman SMF ¶ 11, but the Estate argues that this letter "was not written by Mr. Mechling" and "was an Oceanus-created template document that, as part of the Oceanus program, Mr. Mechling was expected to sign and to send to Oceanus." Estate L. R. 56(a)(2) Statement of Facts in Opp'n to Cayman Mot. for Summ. J., ECF No. 247-1 (redacted); ECF No. 250-1 (sealed) at 5 ("Estate Opp'n to Cayman SMF").

At the time, Mr. Mechling was 77 years old, and had been "domiciled in Pennsylvania continuously since graduating college." Cayman SMF ¶¶ 1, 8; *see also* Plaintiff's L. R. 56(a)(2) Statement in Opp' n to Cayman's Mot. for Summ. J., ECF No. 247-1 (redacted); ECF No. 250-1 (sealed) at 2 ("Estate Opp'n to Cayman SMF") (admitting Mr. Mechling was born in December 1929). The parties agree that Mr. Mechling "was not easily taken advantage of, was described by his 'good personal friend' and accountant as a 'bright guy,' and 'very successful' as a businessperson, and would not typically sign a document without reading its contents."[5] Cayman SMF ¶ 7; Estate Opp'n to Cayman SMF at 4.

On May 24, 2007, before Mr. Mechling applied for the Policies, *see* Estate SMF ¶ 31, three trusts were established: (1) the Russell B. Mechling, Jr. Irrevocable Life Insurance Trust, a California Trust (the "California Trust"), (2) The Russell B. Mechling, Jr. 2007 Irrevocable Trust, a Wisconsin Trust (the "Wisconsin Trust"), and (3) The Russell B. Mechling, Jr. 2007 Irrevocable Subtrust, a Wisconsin Trust (the "Sub-Trust"). Estate SMF ¶¶ 27–30. For both the Wisconsin Trust and the California Trust, Mr. Mechling was the settlor, and his wife and children were the initial beneficiaries. Estate SMF ¶ 28, 30; Cayman SMF ¶ 24, 34.

The Administrative Trustee of the Wisconsin Trust was DeWitt, Oceanus's law firm, and the Investment Trustee was Mr. Mechling's accountant. Estate SMF ¶ 28; Ex. 18 to Estate SMF, ECF No. 221-6 at 1 ("Wisconsin Trust Agreement"). The trust agreement contained a Wisconsin choice-of-law clause. Estate SMF ¶ 28; Wisconsin Trust Agreement at 1.

---

[5] The parties dispute the extent to which Mr. Mechling understood the transaction with Oceanus. The Estate argues that Mr. Mechling "didn't understand all the details of the Oceanus transaction," Estate SMF ¶ 23, and "nothing in the record suggests that he was sophisticated with respect to life insurance." Estate Opp'n to Cayman SMF at 3. Cayman, however, claims that alleges that he did understand the details, and represented that he was "knowledgeable, sophisticated and experienced in making business decisions," Cayman Opp'n SMF at 16–17.  .

The Wisconsin Trust was the settlor and the beneficiary of the Sub-Trust, and DeWitt was the Trustee. Estate SMF ¶ 29; Cayman SMF ¶ 35, 36. "Among the stated purposes of the [Wisconsin Sub-Trust] was 'to acquire equitable title to one or more insurance policies issued upon the life of Russell B. Mechling, Jr., and to receive all of the proceeds from such policies upon' his death." Estate SMF ¶ 29; Ex. 19 to Estate SMF, ECF No. 221-7 at 4 ("Wisconsin Sub-Trust Agreement"). The Wisconsin Sub-Trust Agreement "gave DeWitt the power . . . '[t]o hold any … life insurance policy … in the name of a nominee, without mention of any trust … in the records of the … insurance carrier.'" Estate SMF ¶ 29; Wisconsin Sub-Trust Agreement at 5.

Catherine D. Williams, a California resident, was the Trustee for the California Trust, and Mr. Mechling's wife and six of his children were its initial beneficiaries. Cayman SMF ¶¶ 17, 24; Estate SMF ¶ 30; Ex. 20 to Estate SMF, ECF No. 221-8 at 1 ("California Trust Agreement"). Under the agreement for the California Trust, Ms. Williams had the power to "merge all of the trust property . . . with the property of any other trust created by [Mr. Mechling] which is held for the benefit of the same beneficiaries and . . . transfer all of the trust property held hereunder to that other trust, to be administered under the instrument governing that other trust." Estate SMF ¶ 30; California Trust Agreement at 3. The California Trust was signed in Pennsylvania, and "was subject to a California choice-of-law clause." Estate SMF ¶ 30; California Trust Agreement at 10, 13–14.

Around May 2007, U.S. Bank opened a checking account for the Wisconsin Trust. Estate SMF ¶ 65. Ex. 40 to Estate SMF, ECF No. 221-18.[6]

After the trusts were created, the Policies were applied for. Estate SMF ¶ 31. Although the applications for the Policies state that it was signed in California, the parties agree that Mr.

---

[6] While Cayman objects to that the evidence supporting this statement is inadmissible hearsay, the document is likely admissible as a business record. Fed. R. Civ. P. 803(6).

Mechling and his insurance agent signed the Policies in Pennsylvania. Estate SMF ¶ 32; Ex. 7 to Estate's SMF, ECF No. 225-5 at 30; Ex. 8 to Estate's SMF, ECF No. 225-6 at 30. The Policies had "Issue Dates" of June 10, 2007. Estate SMF ¶ 37.

"The Policies were approved for use in California, and utilized California forms. They bore the lettering 'CA' on numerous pages and contained legal disclosures related to California law, including the 'California Life and Health Insurance Guaranty Association Act.'" Cayman SMF ¶ 21.

On July 2, 2007, the Policies were shipped to an individual in Irvine, California. Cayman SMF ¶ 26.

On July 9, 2007, Mr. Mechling and his wife signed a Consent and Acknowledgement Agreement with Oceanus that contained a Wisconsin choice-of-law clause. Estate SMF ¶ 40; Ex. 24 to Estate SMF, ECF No. 221-10 at 7 ("Consent and Acknowledgment Agreement"); Cayman SMF ¶ 29.

On July 10, 2007, under a Merger Agreement with no choice-of-law clause, the California Trust and the Sub-Trust were merged. Estate SMF ¶ 40–41; Ex. 25 to Estate SMF, ECF No. 221-11 at 2 ("Merger Agreement"); Cayman SMF ¶ 33, 37.

A Nominee Agreement became effective on that same date that allowed the Sub-Trust to hold the Policies "in the name of a nominee," Ms. Williams, "without any mention of the [Sub-Trust's] equitable ownership of the [P]olic[ies] in the records of the insurance carrier." Estate SMF ¶ 42; Ex. 27 to Estate SMF, ECF No. 221-13 at 1–2 ("Nominee Agreement"). "The Nominee Agreement further provided that, although Ms. Williams would thus be represented to the insurance company as the owner of the Policies, Ms. Williams 'may not take any action with respect to any of the Policies, or exercise any incidents of ownership with respect to any of the

Policies, without prior express written instruction from the' Wisconsin Sub-Trust." Estate SMF ¶ 42 (quoting Nominee Agreement at 2).

Under the terms of the Merger Agreement, the California Trust was terminated after "transferring all [of its] assets . . . to the Sub-Trust and satisfying its obligations under the Nominee Agreement." Merger Agreement at 2; Estate SMF ¶ 41; Cayman Opp'n SMF at 25.

On July 13, 2007, the delivery receipts for the Policies were signed by Ms. Williams. Cayman SMF ¶ 27; Estate SMF ¶ 38.

On that same date, Oceanus wired the initial premium payments to PHL. Estate SMF ¶ 39. "By their terms, the Policies did not 'take effect unless and until,' among other things, 'the premium required for issuance . . . has been paid in full.'" Estate SMF ¶ 39.

Also on July 13, 2007, under an Option Agreement with a Wisconsin choice-of-law clause, Oceanus purchased an "Option . . . grant[ing] to Oceanus the right to purchase all of the beneficial interests in the . . . Sub-Trust and therefor the underlying Policies," *see* Consent and Acknowledgment Agreement at 1, in exchange for an "Option Premium" and a "Strike Price" payable "[i]n exchange for, and in consideration of, the purchase of all of the beneficial interests in [the] Sub-Trust." Ex. 26 to Estate SMF, ECF No. 221-12 at 3 ("Beneficial Interests Option Agreement"); *see also* Estate SMF ¶ 40, 44; Cayman SMF ¶ 38.

On October 31, 2007, DeWitt sent a $300,000 payment to Mr. Mechling's wife in connection with the issuance of the Policies. Cayman SMF ¶ 41.

On or around July 17, 2009, Oceanus "exercised the option and thereby obtained by assignment the beneficial interest in the Wisconsin Sub-Trust and thus ownership of the Policies." Estate SMF ¶ 47.[7]

---

[7] Oceanus was subsequently dissolved, and, the parties agree that Cayman later acquired Oceanus's beneficial interest in the Policies and paid premiums on the policies. Cayman SMF ¶¶ 45–46

On July 30, 2009, DeWitt sent Mr. Mechling's wife an additional check in the amount of $28,243 for the "Strike Price." Cayman SMF ¶ 44.

A third-party contacted Mr. Mechling and his family to inquire about his health through the entirety of the Policies' existence, and Mr. Mechling "never complained about these calls or letters." Cayman SMF ¶ 68. "Neither [Mr. Mechling] nor his family members ever contacted PHL, the California Trustee, the Administrative Trustee, or any other owner of the Policies to try to regain control of the Policies, unwind the transfer of the Policies, or assume responsibility for paying the Policies' premiums." Cayman SMF ¶ 69.

On October 16, 2020, Mr. Mechling died. Cayman SMF ¶ 48. Mr. Mechling had never been to Wisconsin, did not own property in Wisconsin, and never earned income or conducted business in the state. Cayman SMF ¶ 52, 53.

US Bank serves as a securities intermediary, and holds property credited to Cayman's Securities Account as a custodian separate and apart from US Bank's own assets. U.S. Bank's Statement of Material Facts, ECF No. 224-2 ¶ 4.

"Under the agreements by which U.S. Bank and the beneficial owners (including [Cayman]) agreed that U.S. Bank would serve as securities intermediary, U.S. Bank and the beneficial owners (including [Cayman]) . . . agreed, pursuant to the UCC, to treat as 'financial assets' all life-insurance policies and proceeds held by U.S. Bank for [Cayman][,]" and "[Cayman] agreed to indemnify U.S. Bank." Estate SMF ¶ 66.

### B.  Procedural History

The Court assumes familiarity with the procedural history of this case and includes only events relevant to the motions for summary judgment. *See* Order denying Motion to Dismiss Second Amended Complaint, ECF No. 156 (Feb. 2, 2024) ("Order re MTD").

On September 1, 2023, the Estate filed the Second Amended Complaint, which is the operative pleading in this case. SAC.

On February 2, 2024, the Court denied the motion to dismiss the Second Amended Complaint. Order re MTD.

On February 16, 2024, Cayman and US Bank filed their respective answers to the Second Amended Complaint. *See* Answer, ECF No. 158; Answer, ECF No. 159.

On February 14, 2025, the Estate filed its motion for summary judgment, with certain portions and exhibits filed under seal. Estate Mot. for Summ. J., ECF No. 220; Estate Mem. in Supp. of Mot. for Summ. J., ECF No. 222 (redacted); ECF No. 227 (sealed) ("Estate Mot.").

On the same date, Cayman filed its motion for summary judgment, with certain portions and exhibits filed under seal. Cayman Mot. for Summ. J., ECF No. 229; Cayman Mem. in Supp. of Mot. for Summ. J., ECF No. 229-1 (redacted); ECF No. 231 (sealed) ("Cayman Mot.").

US Bank likewise filed its motion for summary judgment on that date, and sealed certain portions and exhibits. US Bank Mot. for Summ. J., ECF No. 224; US Bank Mem. in Supp. of Mot. for Summ. J., ECF No. 224-1 (redacted); 228 (sealed) ("US Bank Mot.").

On April 18, 2025, the parties filed their opposition memoranda. US Bank Mem. in Opp'n, ECF No. 239 (redacted); ECF No. 241 (sealed) ("US Bank Opp'n"); Estate Mem. in Opp'n re US Bank Mot. for Summ. J., ECF No. 243 (redacted); ECF No. 245 (sealed) ("Estate Opp'n re US Bank"); Cayman Mem. in Opp'n, ECF No. 246 (redacted); ECF No. 249 (sealed) ("Cayman Opp'n"); Estate Mem. in Opp'n re Cayman, ECF No. 247 (redacted);  ECF No. 250 (sealed) ("Estate Opp'n re Cayman").

On that same date, the Estate withdrew its unjust enrichment claim in Count Two of the Second Amended Complaint, which brought. Not. re Pl.'s Withdrawal of Count 2, ECF No. 242.

On May 23, 2025, the parties filed their replies. US Bank Reply, ECF No. 254 (redacted); ECF No. 256 (sealed) ("US Bank Reply"); Estate Reply, ECF No. 257 (redacted), ECF No. 259 (sealed) ("Estate Reply"); Cayman Reply, ECF No. 260 (redacted); ECF No. 262 (sealed) ("Cayman Reply").

On July 11, 2025, Cayman filed a notice of supplemental authority. Cayman Not. of Supp. Authority, ECF No. 264 ("Cayman Supp. Authority").

On July 14, US Bank filed a notice of supplemental authority. US Bank Not. of Supp. Authority, ECF No. 265 ("US Bank Supp. Authority").

On July 24, 2025, the Estate filed a response to the Defendants' notices of supplemental authority. Resp. re Nots. Of Supp. Authority, ECF No. 268 ("Estate Opp'n re Supp. Authority").

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)

("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-cv-01559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007). In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving

party on the issue for which summary judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

The same standards apply to cross-motions for summary judgment. A court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Make the Road by Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004) (citations omitted). A court must deny both parties' motions for summary judgment if it finds the existence of disputed material facts. *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("Moreover, even when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party.").

## III.    DISCUSSION

The Estate asks the Court to enter judgment against the Defendants on its remaining claim brought under Wisconsin Law Section 631.07(4) and Wisconsin common law because it contends Wisconsin law applies, and, because it alleges the Policies were STOLI policies, the Estate is entitled to their proceeds under Wisconsin law.

Cayman and US Bank ask the Court to enter judgment against the Estate. Cayman argues that the Estate's claim should be dismissed because California or Pennsylvania law, not Wisconsin law, applies to this action. Moreover, US Bank and Cayman assert that, even if Section 631.07(4) applies, the Estate's claims fail. Cayman argues, among other things, that the Estate is not equitably entitled to the proceeds of the Policies. US Bank claims that because it is merely a securities intermediary that does not currently have the proceeds, and never held the proceeds for its own benefit, the Estate can have no valid claim against it.

The Court will first determine which state's law applies to this action, and, as it concludes Wisconsin law likely applies to this action, will then address the parties' arguments as to the merits of the Estate's claims.

### A.  The Choice-of-Law Analysis

#### 1.  Conflict Between Relevant Jurisdictions

"The court need not embark on a choice-of-law analysis in the absence of an actual conflict between the applicable rules of the relevant jurisdictions.'" *Ultimate Nutrition, Inc. v. Leprino Foods Co.*, 747 F. Supp. 3d 371, 378 (D. Conn. 2024) (citation and internal quotation marks omitted)).

Here, there is a conflict between Wisconsin law and that of Pennsylvania and California that makes summary judgment appropriate. Under Wisconsin law, if "the policyholder lacks insurable interest . . . a court with appropriate jurisdiction may order the proceeds to be paid to someone other than the person to whom the policy is designated to be payable, who is equitably entitled thereto, or may create a constructive trust in the proceeds or a part thereof, subject to terms and conditions of the policy other than those relating to insurable interest or consent." Wis. Stat. Ann. § 631.07(4).

Under Pennsylvania law, however, so long as a life insurance policy is issued in accordance with Section 512 of Title 40 of the Pennsylvania Statutes, which requires that it have a valid insurable interest at its inception, *see Principal Life Ins. Co. v. DeRose*, No. 1:08-CV-2294, 2011 WL 4738114, at *7 (M.D. Pa. Oct. 5, 2011) ("[U]nder § 512 the insurable interest requirement is determined solely by the relationship between the insured and the policy beneficiaries."), "no transfer of such policy or any interest thereunder shall be invalid by reason of a lack of insurable interest of the transferee in the life of the insured or the payment of premiums thereafter by the

transferee." 40 Pa. Cons. Stat. § 512. Likewise, under applicable California law, "an interest in the life or health of a person insured must exist when the insurance takes effect, but need not exist thereafter or when the loss occurs." Cal. Ins. Code § 286; *see also* Cal. Ins. Code § 10130 ("A life or disability policy may pass by transfer, will or succession to any person, whether or not the transferee has an insurable interest. Such transferee may recover upon it whatever the insured might have recovered.").[8] Thus, whereas the Estate may be equitably entitled to the proceeds of the alleged STOLI Policies under Wisconsin law, it has no such entitlement under applicable Pennsylvania or California law.

As a result, because there is an outcome-determinative conflict between the laws of Wisconsin and those of California and Pennsylvania, a choice-of-law analysis is appropriate here.[9]

---

[8] Here, the Policies were issued before the California Legislature modified its insurance code to include stronger prohibitions on STOLI policies, *see* Cal. Ins. Code § 10110.1(d) (2010) ("Trusts and special purpose entities that are used to apply for and initiate the issuance of policies of insurance for investors, where one or more beneficiaries of those trusts or special purpose entities do not have an insurable interest in the life of the insured, violate the insurable interest laws and the prohibition against wagering on life."), and this "statute does not apply retroactively" *Wells Fargo Bank, N.A. v. Am. Nat. Ins. Co.*, 493 F. App'x 838, 840 (9th Cir. 2012) (unpublished disposition).

[9] While the Estate argues that its claim in Count One could proceed even if California or Pennsylvania law were to apply, *see* Estate Opp'n re Cayman at 37, the Court disagrees. Apart from the fact that the Estate has voluntarily withdrawn its unjust enrichment claim, and its only remaining claim in Count One is predicated entirely upon Wisconsin law, *see* SAC at 12–13 ("COUNT 1 RECOVERY OF INSURANCE PROCEEDS PURSUANT TO WI ST § 631.07(4) AND WISCONSIN COMMON LAW"), because the undisputed facts establish that, Mr. Mechling at least participated in applying for the Policies and, at their inception, the initial beneficiaries of the Policies were Mr. Mechling's wife and children, *see* Cayman SMF ¶¶ 17, 24; Estate SMF ¶¶ 30–31, the Estate fails to show its equitable entitlement to the proceeds of the Policies under the laws of either state, at least at this time. *See Est. of Barsky v. Wilmington Tr. Co.*, No. CV 20-4282, 2021 WL 4262323, at *4 (E.D. Pa. Sept. 17, 2021) ("There is no true conflict between California law and Pennsylvania law on insurable interests and transfers of life insurance policies. Both states expressly permit the type of life insurance transaction undertaken by Mr. Barsky and the investor defendants in this case."); *see also DeRose*, 2011 WL 4738114, at *5 ("[Section 512] does not contain any language referencing the 'intent of the parties' at inception or that subsequent transfers of policies must be in 'good-faith.'"); *Lincoln Nat. Life Ins. Co. v. Gordon R.A. Fishman Irrevocable Life Tr.*, 638 F. Supp. 2d 1170, 1179 (C.D. Cal. 2009) (finding "California law recognizes that the fact a insurance policy is secured by assignment to a creditor does *not* change or otherwise impact the determination of whether an insurable interest exists (a proposition that may well change with legislative hearings in the California legislature)" but noting "despite the fact that the Court finds that the law compels that it award summary judgment to defendants, it must be added that MCC's finance program skirts close to the letter, and certainly can be viewed as violating the spirit, of the law"); *Hartford Life & Annuity Ins. Co. v. Doris Barnes Fam. 2008 Irrevocable Tr.*, No. CV 10-7560 PSG DTBX, 2011 WL 759554, at *3 (C.D. Cal. Feb. 22, 2011) ("While there need be an insurable interest for a life insurance policy to be valid, that interest is only required to be present 'when the insurance takes effect,' and not necessarily anytime after, including when the 'loss occurs.'" (quoting Cal. Ins.Code § 286)).

## 2. "Most Significant Relationship" Test

"[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13 (1981). "In a diversity of citizenship action, the choice of law rules of the forum state apply." *Weber v. Nat'l R.R. Passenger Corp.*, No. CIV. B-84-564 (WWE), 1986 WL 10333, at *1 (D. Conn. May 7, 1986) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). "In Connecticut, the law of the state with the 'most significant relationship' to the transaction and parties ought to be applied absent a choice of law provision in the insurance contract." *Farm Fam. Cas. Ins. Co. v. Samperi*, 242 F. Supp. 3d 83, 87 (D. Conn. 2017). Connecticut follows the Restatement (Second) of Conflict of Laws (the "Restatement") to determine the state with the "most significant relationship" to the matter at issue. *Greystone Cmty. Reinvestment Ass'n, Inc. v. Berean Cap.,* 638 F. Supp. 2d 278, 286 (D. Conn. 2009). Because this case concerns life insurance policies, the Court's choice-of-law determination here involves an analysis of §§ 6, 188, and 192 of the Restatement. *See Holjes v. Lincoln Nat'l Life Ins. Co.*, 766 F. Supp. 3d 354, 359 (D. Conn. 2025) ("[A] choice-of-law analysis for a long-term disability contract involves an analysis of §§ 188, 192, and 6 of the Restatement (Second) of Conflict of Laws."); *see also Gen. Acc. Ins. Co. v. Mortara*, 101 A.3d 942, 946 (Conn. 2014) ("[T]he choice of law determination in this case involves an interplay among §§ 193, 188 and 6 of the Restatement (Second).").

In general, to determine which state has the "most significant relationship," courts look to the non-exclusive factors enumerated in Section 6(2) of the Restatement, which are "applicable to all substantive areas," *Reichhold Chemicals, Inc. v. Hartford Acc. & Indem. Co.*, 703 A.2d 1132,

1136 (Conn. 1997):

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971).

Connecticut courts have also adopted context-specific portions of the Restatement, including Section 188, which concerns contracts, and Section 192, which concerns life insurance contracts.

Under Section 188, where there has not been a choice-of-law by the parties, the choice-of-law with respect to an issue in contract is "determined by the local law of the state which . . . has the most significant relationship to the transaction and the parties under the principles stated in § 6." Restatement (Second) of Conflict of Laws § 188(1); *see also Aruba Hotel Enterprises N.V. v. Belfonti*, 611 F. Supp. 2d 203, 208 (D. Conn. 2009). In the absence of an effective choice-of-law by the parties, the following contacts are to be considered:

> (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Conflict of Laws § 188(2); *see also Reichhold Chemicals, Inc.,* 703 A.2d at 1138 ("[T]he § 188 general presumption, . . . provides that unless another state has an overriding policy-based interest in the application of its law, the law of the state in which the bulk of the contracting transactions took place should be applied.").

Section 192 applies to life insurance contracts that have been "issued to the insured upon his application." *Id*. § 192. In the absence of an effective choice-of-law by the parties, "[t]he validity of [such] life insurance contract . . . and the rights created thereby are determined . . . by

the local law of the state where the insured was domiciled at the time the policy was applied for, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied." *Id*. § 192. However, Comment A to Section 192 states that "[t]he rule does not apply to life insurance issued upon the life of someone other than the applicant; as to such insurance, no more definite rule can be stated, in the absence of an effective choice of law by the parties, than that stated in § 188." *Id*. § 192, Comment A.

The Estate argues that Wisconsin has the most significant relationship to the dispute. It contends that courts adjudicating STOLI cases often apply the law of the state where the policy was issued and delivered, which the Estate asserts is Wisconsin, and "give little weight" to the domicile of the insured. Estate Mot. at 15.[10] The Estate also argues that Wisconsin's strong public policy against STOLI transactions should weigh in favor of applying its law. *Id.* at 16.

Cayman argues that either California or Pennsylvania law governs. It maintains that Wisconsin has no material connection to the transaction: the insured, Mr. Mechling, never lived in Wisconsin, conducted no business there, and held no property there. Cayman Mot. at 26. Cayman contends that California has the most significant relationship, because the policies were physically delivered to California, the initial policy owner (the California Trust) was domiciled in California, and the Delivery Receipts were signed in California. Cayman Mot. at 24–25; Cayman Opp'n at 23–24. Alternatively, it argues that Pennsylvania, as the insured's domicile and location of the subject of the insured risk (Mr. Mechling's life), presumptively applies Pennsylvania law as the insured's state of residence at the time of application under Restatement § 192. Cayman Mot. at 25; Cayman Opp'n at 25–26.

---

[10] Where the internal pagination of a document conflicts with the ECF-generated pagination, this Order will refer to the ECF-generated pagination.

In response, the Estate argues that Cayman misapplies the Restatement by overemphasizing § 188(2), which governs contracts, while ignoring the broader § 6(2) factors. Estate Opp'n re Cayman at 8–9. The Estate further claims that initial ownership by the California Trust is irrelevant, because the policies took effect after the California Trust merged into the Wisconsin Sub-Trust, and thus the Policies were delivered to and owned by the Sub-Trust in Wisconsin. Estate Opp'n re Cayman at 9; Estate Reply at 6–7. Finally, the Estate also challenges any reliance on the policies' references to California law, arguing Mechling had no notice of such clauses. Estate Opp'n re Cayman at 19.

Additionally, the Estate argues that Restatement § 192 does not apply because the policy was not issued to the insured upon his own application, but rather to a trust created by a third party. Estate Opp'n re Cayman at 21. They highlight Comment A to § 192, which provides that if someone other than the insured applies for the policy, § 188 governs instead. *Id*. Cayman is said to have conceded that the applicant was an Oceanus-controlled trust, not Mr. Mechling himself. Estate Opp'n re Cayman at 21. Finally, the Estate asserts that Wisconsin law should apply to vindicate Wisconsin's public policy against STOLI arrangements. They contend that applying any law that would allow the Defendants to profit from such a scheme would contradict Wisconsin's legislative intent. Estate Reply at 8–9.

Cayman replies by reaffirming that physical delivery occurred in California, asserting that this gives California the paramount interest under the Restatement analysis. Cayman Reply at 8. Cayman disputes the legal significance of the Wisconsin Sub-Trust's situs, asserting that the delivery, ownership, and performance aspects all point away from Wisconsin. *Id*.

The Court disagrees.

### i. Choice-of-Law Clauses

Under Section 187(1) of the Restatement, "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement (Second) of Conflict of Laws § 187(1). If the particular issue "is one which the parties could not have resolved by an explicit provision in their agreement," the law of the state chosen by the parties will still govern unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Id.* § 187(2); *see also Elgar v. Elgar*, 679 A.2d 937, 943–44 (Conn. 1996).

Here, the parties identify various choice-of-law clauses embedded in different agreements: the Wisconsin Trust Agreement, the Consent and Acknowledgement Agreement and Beneficial Interests Option Agreement each contain a Wisconsin choice-of-law clause, Estate SMF ¶ 29, 40. By contrast, the California Trust contains a California choice-of-law clause. Estate SMF ¶ 30. The Policies themselves, however, contain no explicit choice-of-law provisions. *See* Ex. 7 to Estate's SMF, ECF No. 225-5 at 18; Ex. 8 to Estate's SMF, ECF No. 225-6 at 18 ("Any benefits provided are not less than that required by law of the state where this policy was delivered."); *see also 2004 Stu art Moldaw Tr. v. XE L.I.F.E., LLC*, 642 F. Supp. 2d 226, 239 (S.D.N.Y. 2009), *aff'd,* 374 F. App'x 78 (2d Cir. 2010) ("[T]he plaintiffs' citation to choice-of-law provisions in various transaction documents is unpersuasive.").

As a result, the Court will turn to the principles set forth in Sections 192, 188, and 6 of the

Restatement.

### ii. Section 192 of the Restatement

"[I]n the absence of a valid choice-of-law provision, the Restatement establishes a special presumption in favor of application of the law of the jurisdiction where the insured was domiciled at the time the policy was applied for." *Holjes*, 766 F. Supp. 3d at 360 (citing Restatement (Second) of Conflict of Laws § 192). In cases involving alleged STOLI policies, however, courts have placed lesser emphasis on the location of the insured. *See U.S. Bank Nat'l Ass'n v. Sun Life Assurance Co. of Canada*, No. CV144703SJFARL, 2016 WL 8116141, at *14 (E.D.N.Y. Aug. 30, 2016), *report and recommendation adopted*, No. 14CV4703SJFARL, 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017) ("Even if Mr. Van de Wetering, as the insured, could be considered the 'applicant' of the Policy, § 192 would still not dictate the application of New York law because Delaware has a 'more significant relationship ... to the transaction and the parties,' . . . and the two contacts relied upon by U.S. Bank are outweighed by Delaware's overwhelming contacts." (citing Restatement (Second) of Conflict of Laws § 192; *Settlement Funding, LLC v. AXA Equitable Life Ins. Co.*, No. 06 CV 5743, 2010 WL 3825735, at *13 (S.D.N.Y. Sept. 30, 2010) ("AXA points only to Adler's residence in Ohio, and asserts that the New York contacts are merely 'sham' and 'illusory' as a result of the impropriety of everyone involved in the transactions. Even if cloaked as they may be in fraud and wrongdoing, the greatest concentration of significant events and entities are nonetheless in New York."); *and Kramer v. Lockwood Pension Servs., Inc.*, 653 F. Supp. 2d 354, 394 (S.D.N.Y. 2009) (finding arguments that insured was domiciled in Connecticut to be "unavailing where the Broker for Lincoln negotiating the policy was based at all relevant times in New York and the beneficiary of the policy was a New York trust")); *see also Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, No. CV145789PGSLHG, 2016 WL 5746352, at *7

(D.N.J. Sept. 30, 2016), *aff'd sub nom. Sun Life Assurance Co. of Canada v. Wells Fargo Bank NA*, 779 F. App'x 927 (3d Cir. 2019) (finding Restatement Section 192's presumption did not apply because "[w]hile Mrs. Bergman was the Insured, she appears to have been a means by which the Policy was conveyed to the Trust for the benefit of investors").

As a result, while Pennsylvania law would presumptively apply in a typical insurance dispute, *see Reichhold Chemicals, Inc. v. Hartford Accident & Indem. Co.*, 750 A.2d 1051, 1059 (Conn. 2000) ("In the absence of extraordinary circumstances, the law of the state where the principal insured risk is located will apply."), given the unique circumstances here, and the potential application of Comment A to Section 192, the Court will examine the principles set forth in Sections 188 and 6 of the Restatement. *See* Restatement (Second) of Conflict of Laws § 192 Comment A. ("The rule does not apply to life insurance issued upon the life of someone other than the applicant; as to such insurance, no more definite rule can be stated, in the absence of an effective choice of law by the parties, than that stated in § 188."); *see also Sun Life*, 2016 WL 5746352, at *7 ("Mrs. Bergman's domicile is not as important here as it would be in a typical insurance dispute, because she was merely a vessel to further an investment scheme.").

### iii. Section 188 of the Restatement

Under Section 188(2) of the Restatement, the court considers five key contacts in determining which state has the most significant relationship to the insurance contract:

> (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Conflict of Laws § 188(2) "Connecticut has adopted the 'general presumption' of § 188 which provides that 'unless another state has an overriding policy-based interest in the application of its law, the law of the state in which the bulk of the contracting

transactions took place should be applied.'" *Phillips v. Scott*, 446 F. Supp. 2d 70, 80 (D. Conn. 2006) (quoting *Reichhold Chemicals, Inc.,* 703 A.2d at 1138); *see also* Restatement (Second) of Conflict of Laws § 188(3).

As for the location of the subject matter of the contract, as discussed above, while for insurance companies this factor typically weighs in favor of the law of the state where the insured is domiciled, in cases involving alleged STOLI policies, the location of the insured is given less weight.

"[T]he place of contracting is the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect, assuming, hypothetically, that the local law of the state where the act occurred rendered the contract binding." Restatement (Second) of Conflict of Laws § 188, Comment E. "The place of contracting, . . ., rarely stands alone and, almost invariably, is but one of several contacts in the state." *Id.* In evaluating this factor, however, courts consider the place where the contract is signed. *See Discover Prop. & Cas. Ins. Co. v. Tetco, Inc.*, No. 3:12CV473 JBA, 2014 WL 685367, at *4 (D. Conn. Feb. 19, 2014) ("Based on the affidavits submitted by the parties, the Letter Agreement appears to have been negotiated and executed in Texas."). Here, the parties agree that the Policies were signed in Pennsylvania and California. Estate SMF ¶ 32. Likewise, the Consent and Acknowledgement Agreement indicates that it was signed in Pennsylvania. Consent and Acknowledgment Agreement at 8. The Estate also alleges that this agreement, and other agreements related to the creation of the trusts and Oceanus's option "were last signed by a Wisconsin party," DeWitt. Estate Mot. at 23. Given that parties in Pennsylvania, California, and Wisconsin each played a role in rendering the contract binding, this factor is neutral.

Likewise, while the place of negotiation typically "is a significant contact," Restatement (Second) of Conflict of Laws § 188, Comment E, here, where the transaction contains negotiations with parties in Wisconsin, Pennsylvania, and potentially California, this factor is given little weight. *See* Restatement (Second) of Conflict of Laws § 188, Comment E. ("This contact is of less importance when there is no one single place of negotiation and agreement, as, for example, when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone.").

"Some jurisdictions hold that the place of performance for an insurance policy, unless the policy explicitly provides otherwise, is where the premiums are received. Connecticut has no such bright-line rule." *QSP, Inc. v. Aetna Cas. & Sur. Co.*, No. 326873, 1998 WL 892997, at *15 (Conn. Super. Ct. Dec. 8, 1998) (citations omitted); *but see United Techs. Corp. v. Am. Home Assur. Co.*, 989 F. Supp. 128, 135 (D. Conn. 1997) ("Under Connecticut law, another relevant contact for purposes of determining the place of performance occurs when the insured receives payment for a claim."). Here, Oceanus wired from Wisconsin the premiums for the Policies to PHL in Connecticut. Estate SMF ¶ 39; *see also* Ex. 23 to Estate SMF, ECF No. 225-14 (showing wire receipt records from Oceanus LLC's US Bank Wisconsin bank account). Moreover, taking a broader view of the transaction between the ultimate beneficiary of the Policies and Oceanus, all parties to the Beneficial Interests Option Agreement, granting Oceanus an option to acquire the beneficial interests in the parties, are referred to in the agreement as Wisconsin entities. *See* Beneficial Interests Option Agreement at 1. As a result, Wisconsin has stronger ties to the place of performance than either California or Pennsylvania.

For "the domicil[e], residence, nationality, place of incorporation and place of business of the parties," while the parties agree that Mr. Mechling was "domiciled in Pennsylvania

continuously since graduating college," Cayman SMF ¶ 1, and Oceanus was incorporated in Wisconsin, Estate SMF ¶ 8, questions of fact remain as to whether the team responsible for administering Oceanus's interest in the Policies was based in Wisconsin or California. Cayman argues that individuals that the Estate claims "were involved in designing and operating the Oceanus program," Estate SMF ¶ 25, were located in Irvine, California. Cayman Opp'n SMF at 5–6; *id.* at 42–43; *see also* Ex. 11 to Estate SMF, ECF No. 225-8 at 4 ("At our . . . Kickoff Meeting last Friday in Irvine, we learned we would have Oceanus . . . as part of our origination program."). As "a corporation's principal place of business is a more important contact than the place of incorporation," Restatement (Second) of Conflict of Laws § 188, Comment E, this disputed fact is significant to the analysis of this factor.

Moreover, as Cayman emphasizes, the original "Owner" of the Policies was a California-based trust, Ex. 7 to Estate's SMF, ECF No. 225-5 at 30; Ex. 8 to Estate's SMF, ECF No. 225-6 at 30, and the parties agree that the Policies "were approved for use in California, and utilized California forms." Cayman SMF ¶ 21. In addition, while the parties dispute the place of delivery, they agree that the delivery receipts for the Policies were signed in California and that the policies were physically delivered in California. Estate SMF ¶ 38; Cayman SMF ¶ 27.

Accordingly, questions of fact remain that prevent a clear determination of the state with the "most significant relationship," under Section 188, although these factors favor either California or Wisconsin law. While this would indicate that summary judgment is inappropriate, because the multi-state nature of the parties' contracting and negotiation suggests that, even with clarity on Oceanus's connection to California, Section 188's factors may not be dispositive without consideration of factors set forth in Section 6. Thus, the Court will briefly address those factors here, with a focus on contacts between these two states.

### iv. Section 6 of the Restatement

Under Section 6 of the Restatement, courts consider seven non-exclusive factors in determining the state with the "most significant relationship" to the dispute at issue.

Several factors are concerned with ensuring consistency and predictability across similar cases in multiple jurisdictions, and/or aligning with the parties' expectations regarding the transaction. *See* Restatement (Second) of Conflict of Laws § 6 ("(a) the needs of the interstate and international systems, . . . (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied."); *id.* § 6 Comment D ("Adoption of the same choice-of-law rules by many states will further the needs of the interstate and international systems and likewise the values of certainty, predictability and uniformity of result."); *id.* Comment G ("Generally speaking, it would be unfair and improper to hold a person liable under the local law of one state when he had justifiably molded his conduct to conform to the requirements of another state.").

As discussed above, because in STOLI cases, the beneficial interest in the Policies are owned by a Trust established for the purpose of transferring that beneficial interest to a third-party, courts have often found that considerations such as the location of the Trust holding the policy, while not a dispositive factor alone, often has the most significant relationship to the matter. *See U.S. Bank*, 2016 WL 8116141, at *12 (applying Delaware law where insured resided in New York because "original owner of the Policy was a Delaware statutory trust," "all of the policy documents . . ., represent that they had been signed in Delaware," "the Policy was issued on application and policy forms that were approved in advance by the Delaware Department of Insurance" and "the Policy was delivered in Delaware"); *Sun Life*, 2016 WL 5746352, at *8 (applying New Jersey law

where insured resided in New York, and policy was delivered in New York, where, "the Trust was located in New Jersey and the place of contracting was New Jersey"); *Est. of Hopfinger v. U.S. Bank Nat'l Ass'n*, 768 F. Supp. 3d 977, 987 (D. Minn. 2025) (applying Wisconsin law where insured was a Florida resident where "the Policy involved Wisconsin entities and transactions,"; "[t]he investors who set up the Wisconsin Sub-Trust that applied for and owned the Policy, and the trustee of the Sub-Trust (DeWitt Ross), are Wisconsin entities"; "the Policy was issued and delivered to the Wisconsin Sub-Trust"; and "the Insured executed various trust and loan documents that contain Wisconsin choice-of-law clauses"); *Kramer*, 653 F. Supp. 2d at 394 (applying New York law where broker negotiated policy in New York, beneficiary was a New York trust, and trust documents select New York law despite insured's domicile in Connecticut); *cf. 2004 Stuart Moldaw Tr.*, 642 F. Supp. 2d at 237 (applying California law where "plaintiff Trust is organized under the laws of California, and trustee . . . resides in California," insured resided in California, and policies were negotiated in California).

Here, unlike the typical STOLI case, the Trust initially owning the beneficial interest in the Policies was domiciled in California and then transferred ownership of the beneficial interest to a Trust domiciled in a Wisconsin shortly after the Policies were applied for. Moreover, the initial Trust in California was held out to be the Owner of the Policies, even after the Trust had been dissolved. The parties unsurprisingly, have differing interpretations as to the significance and interpretation of these unique facts.

Cayman argues that because the policies "were approved for use in California, and utilized California forms," and because the insurer, PHL, administered the policy under California law, Cayman SMF ¶ 21, 57, "the justified expectations of the parties to the Policies were, plainly, that California law would apply." Cayman Mot. at 25; *see also* Cayman Opp'n at 27–28 ("[E]ven if

the Court credits the Estate's theory . . . that the Insured and the other originators of the Policies were trying to conceal from PHL that the California Trust later would transfer its assets to the Wisconsin-based Sub-Trust . . . that theory emphasizes that the parties' justifiable expectations were that California law would apply at the Policies' inception.").

The Estate, however, contends that "Wisconsin always was the center of the scheme," given that the Wisconsin Sub-Trust was set up to own the Policies, and "the object of the scheme was for Oceanus to exercise its option, pursuant to the Wisconsin-governed Beneficial Interests Option Agreement, to acquire the beneficial interest in the Wisconsin Sub-Trust and thus in the Policies." Estate Mot. at 19–20.

Overall, the majority of Section 6 factors favor Wisconsin law. While the "Owner" of the Policies on the application, and on official documentation thereafter was the California Trust, the documentation between Oceanus, the trusts, and the Mechling family suggests that the parties considered the transaction to be primarily governed under Wisconsin law and directed for the benefit of Wisconsin entities. Two of the three trusts created before applying for the Policies were Wisconsin trusts formed under agreements governed by Wisconsin law, and the Wisconsin Sub-Trust Agreement indicates that the Sub-Trust was created for the purpose of "acquir[ing] equitable title to one or more insurance policies issued upon the life of Russell B. Mechling, Jr., and to receive all of the proceeds from such policies upon." Wisconsin Sub-Trust Agreement at 4. Moreover, even construing the facts in the light most favorable to Cayman, and assuming the policies were delivered to California and the California Trust held the policies before its dissolution, within days of its receipt of the Policies, the California Trust transferred ownership of the Policies to the Sub-Trust and was dissolved, indicating that the "Owner" of the Policies, as understood by the parties, was always intended to be the Wisconsin Sub-Trust.

27

In addition, while PHL continued to send documents to the California Trust and administered the policies in accordance with California law, under the Nominee Agreement, the California Trustee, as well as Oceanus and Mr. Mechling, understood the true Owner of the Policies, and the only entity with all rights to take action with respect to the Policies, to be the Wisconsin Sub-Trust. *See* Nominee Agreement at 1 ("Notwithstanding the fact that the Principal [the Sub-Trust] is now the equitable owner of all of the Policies, the Principal desires to appoint the Nominee [Ms. Williams] as its nominee, to continue holding legal title to the Policies on its behalf under the name 'CATHERINE D, WILLIAMS, as Trustee of the RUSSELL B, MECHLING, JR, IRREVOCABLE LIFE INSURANCE TRUST,' and the Nominee desires to accept such appointment."); *id.* at 2 ("The Nominee may not take any action with respect to any of the Policies, or exercise any incidents of ownership with respect to any of the Policies, without prior express written instruction from the Principal.").

Finally, while not dispositive alone, the fact that several key documents to the transaction, including the Consent and Acknowledgement Agreement, and the Option Agreement had Wisconsin choice-of-law clauses, further demonstrates that the parties could, and likely would, reasonably expect Wisconsin law to apply. *See* Consent and Acknowledgment Agreement at 7; Beneficial Interest Option Agreement at 3. As a result, an analysis of the most significant contacts with respect to the transaction, considering how courts typically resolve choice-of-law disputes in STOLI cases, favors Wisconsin.

As for the "relevant policies of other interested states and the relative interests of those states in the determination of the particular issue," the policies were physically delivered in California and used California forms, and thus California has an interest in regulating insurance policies delivered in its borders and administered under its laws.

Wisconsin law applies to "all insurance policies . . . delivered or issued for delivery in this state, on property ordinarily located in this state, on persons residing in this state when the policy or group certificate is issued, or on business operations in this state." Wis. Stat. § 631.01(1). Cayman argues that because the Policies were physically delivered to California, Section 631 does not apply. *See* Cayman Reply, ECF No. 10–11. The Estate argues that the Court should consider the Policies to be "delivered" to Wisconsin, given that the intended Owner is the Wisconsin Sub-Trust, and, because the Estate alleges that when the Policies went into effect on July 13, 2007, the California Trust was dissolved under the Merger Agreement effective July 10, 2007. Estate Mot. at 13. The Estate further argues that Wisconsin has a strong interest in deterring STOLI schemes orchestrated in its state using "Wisconsin trusts under Wisconsin's trust laws and subject to Wisconsin choice-of-law clauses." *Id.* at 17 (citing Wis. Stat. § 631.07(1)). While the Court does not reach the issue of Section 631.01's applicability to the Policies at issue here, given the unique circumstances of this case, where the Policies were procured for the benefit of a Wisconsin Sub-Trust to further a transaction predominantly governed by Wisconsin law, but utilized California's insurance laws and physically delivered the Policies to California in order to do so, this factor is neutral.

As a result, while the unique circumstances here make the determination of a choice-of-law a close case, Wisconsin law likely has the most significant relationship to this case. As discussed below, however, even assuming without deciding Wisconsin law can, *see* Wis. Stat. § 631.01(1), and does apply here, the Estate fails to show its equitable entitlement to the proceeds of the Policies.

### B.  The Equitable Entitlement Claim

Under Wisconsin Statute Section 631.07(4),

> No insurance policy is invalid merely because the policyholder lacks
> insurable interest or because consent has not been given, but a court
> with appropriate jurisdiction may order the proceeds to be paid to
> someone other than the person to whom the policy is designated to
> be payable, who is equitably entitled thereto, or may create a
> constructive trust in the proceeds or a part thereof, subject to terms
> and conditions of the policy other than those relating to insurable
> interest or consent.

Wis. Stat. Ann. § 631.07(4) ("Section 631.07(4)"). "In other words, a person who takes out a life

insurance policy must have an interest, either financial or familial, in the life of the insured

continuing instead of ending prematurely." *Wells Fargo Bank, N.A. v. Est. of Gold*, No. 22-CV-

6114 (BMC), 2025 WL 1808671, at *4 (E.D.N.Y. July 1, 2025) ("*Gold*"). In enacting the statute,

the Wisconsin legislature codified the "common law principle that . . . forbids a person to own an

insurance policy that insures someone else's life unless the policy owner has an insurable interest

in that life[,]" but "changed the remedy from cancelling the policy to requiring the insurer to honor

its promise." *Sun Life Assurance Co. of Canada v. U.S. Bank Nat'l Ass'n*, 839 F.3d 654, 655–56

(7th Cir. 2016) (citation omitted).

"Payment based on equitable entitlement is only an option available if justice requires

payment to someone other than a designated payee." *Martin v. Tower Ins. Co.*, 349 N.W.2d 90, 92

(Wis. Ct. App. 1984). "The determination of whether one is equitably entitled to insurance

proceeds 'requires a weighing of the factors or equities' in determining whether the policy

proceeds should be paid to 'someone other than the person to whom the policy is designated to be

payable.'" *Est. of Hopfinger*, 768 F. Supp. 3d at 989 (quoting *Disrud v. Arnold*, 482 N.W.2d 114,

117 (Wis. Ct. App. 1992)).

In the context of Section 631.07(4), awarding the party who has an insurable interest in the

property has been found to be an appropriate equitable remedy. *See Disrud*, 482 N.W.2d at 117

("We conclude that the trial court properly applied sec. 631.07(4), which provides '[A] court with

appropriate jurisdiction may order the proceeds to be paid to someone other than the person to whom the policy is designated to be payable, who is equitably entitled thereto . . . ."); *Midwest Com. Funding, LLC v. Cincinnati Specialty Underwriters Ins. Co.*, 399 F. Supp. 3d 736, 750 (E.D. Wis. 2019) ("[I]f an insurer issues a policy to a person who lacks an insurable interest, the insurer is still liable to provide coverage under the policy, but the court may order the proceeds to be paid to someone other than the insured—*i.e.*, to the person who had the insurable interest in the subject of the policy.").

The Estate argues that the Policies lacked a valid insurable interest, and it is equitably entitled to the proceeds of the Policies as the party with an insurable interest in Mr. Mechling's life.[11]

Cayman and US Bank argue that even if Section 631.07(4) were to apply, the Estate fails to show that it is equitably entitled to the proceeds of the policies under the doctrine of unclean hands.

The Court agrees.

The Wisconsin Supreme Court "has recognized the equitable doctrine that a plaintiff who seeks affirmative equitable relief must have 'clean hands' before the court will entertain his plea[.]" *S & M Rotogravure Serv. v. Baer*, 252 N.W.2d 913, 919 (Wis. 1977) (citing *Martinson v. Brooks Equipment Leasing, Inc.*, 152 N.W.2d 849 (Wis. 1967)). "Before a court may deny a plaintiff relief in equity upon the 'clean hands' doctrine, it must clearly appear that the things from which the plaintiff seeks relief are the fruit of its own wrongful or unlawful course of conduct." *S & M*, 252 N.W.2d at 919 (citing *David Adler & Sons Co. v. Maglio*, 228 N.W. 123 (Wis. 1929)).

---

[11] Cayman argues that the Policies had an "insurable interest at inception." Cayman Opp'n at 31 n.16. Because the Court concludes that even if the Policies were STOLI policies subject to Section 631.07(4), the Estate would not be equitably entitled to the proceeds from those policies, the Court assumes without deciding that the Policies lacked an insurable interest under Wisconsin law.

As a recent decision in this Circuit involving similar circumstances noted:

> "Misconduct which will bar relief in a court of equity need not necessarily be of such nature as to be punishable as a crime, or to constitute the basis of legal action. Under this maxim, any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded men, will be sufficient to make the hands of the applicant unclean." . . . One way a party may act wrongfully such that it would bar equitable recovery is for the party to be involved in the transaction through which she gains rights, and then ignore those rights for years.

*Gold*, 2025 WL 1808671, at *6 (quoting *David Adler & Sons Co.*, 228 N.W. at 125).

The Wisconsin Supreme Court has noted, however, that there may be exceptions to the application of the doctrine:

> [I]n cases where both parties are *in delicto* concurring in an illegal act, it does not always follow that they stand *in pari delicto;* for there may be, and often are, very different degrees in their guilt. One party may act under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age; so that his guilt may be far less in degree than that of his associate in the offense. And besides, there may be on the part of the court itself a necessity of supporting the public interests or public policy in many cases, however reprehensible the acts of the parties may be.

*Evans v. Cameron*, 360 N.W.2d 25, 28 (Wis. 1985) (quoting *Feld & Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick, & Cabot*, 458 A.2d 545, 548 (Pa. Super. 1983) (quoting *Story Equity Jurisprudence* § 423 (14th ed. 1918))); *but see Feld*, 458 A.2d at 550 ("[Public policy] is a very unruly horse, and once you get astride it you never know where it will carry you. It may lead you from the sound law. It is never argued at all but when other points fail." (quoting *Richardson v. Mellish,* 130 Eng. Rep. 294, 303 (1824)).

Because "the decedent's personal representative 'stands in the shoes' of the decedent to pursue any claims the decedent may have had, . . . the estate is entitled only to what the decedent would have had if the decedent were living." *Gold*, 2025 WL 1808671, at *5 (E.D.N.Y. July 1, 2025) (citing *Christ v. Exxon Mobil Corp.*, 866 N.W.2d 602, 613 (Wis. 2015); *and Est. of Merrill*

*ex rel. Mortenson v. Jerrick*, 605 N.W.2d 645, 650 (Wis. Ct. App. 1999)). "Accordingly, in determining whether the unclean hands doctrine bars equitable relief for the Estate, the Court considers the cleanliness of the decedent['s], . . , hands." *Gold*, 2025 WL 1808671, at *5.

Here, even construing the evidence in the light most favorable to the Estate, Mr. Mechling and his wife were willing participants in the alleged STOLI scheme, and thus his Estate cannot recover the proceeds of the allegedly illegally obtained Policies. The Estate alleges that Mr. Mechling's estate planner and general business attorney "did not recommend that Mr. Mechling participate in the program as part of his estate plan" and believed that "Mr. Mechling had no need for life insurance at that time from an estate or inheritance tax liquidity standpoint, and the Policies were not part of his estate plan, which had already been well established by that time." Estate SMF ¶ 22. The Estate also alleges that his attorney claimed that, to his knowledge, "Mr. Mechling would not have been able to comfortably afford the premiums for policies of such large size." Estate SMF ¶ 22. The Estate further alleges that, according to his insurance provider, "Mr. Mechling participated in the program because he was 'excited about getting compensation in exchange for applying for life insurance[,]'" and "[i]f he wasn't going to get the money, they wouldn't do the deal." Estate SMF ¶ 19.

The undisputed evidence also shows that Mr. Mechling was a willing participant in the Oceanus Program, and benefitted from his participation in the alleged STOLI scheme. Mr. Mechling was a signatory to the Wisconsin Trust Agreement and the California Trust Agreement, and both he and his wife signed a Consent and Acknowledgment Agreement whereby they "[u]nconditionally and irrevocably consent to . . . the grant of the Option to Oceanus to purchase the beneficial interests in the Sub-Trust . . . in accordance with [the Option Agreement]." Consent and Acknowledgment Agreement at 2. Moreover, Mr. Mechling signed applications for the

33

Policies that represented to the Insurer, PHL, that there was no intention to transfer ownership in the policies. Ex. 7 to Estate's SMF, ECF No. 225-5 at 28; Ex. 8 to Estate's SMF, ECF No. 225-6 at 28 (checking "No" for question "Is there an intention that any party. other than the Owner, will obtain any right, title or interest in any policy issued on the life of the Proposed life Insured(s) as a result of this application?").

In exchange for his participation in the Oceanus Program, Mr. Mechling and his family received a sum totaling several hundred thousand dollars while Mr. Mechling was still alive. Cayman SMF ¶ 67. Moreover, in the more than ten years  between Oceanus exercising its option and Mr. Mechling's death, "[n]either [Mr. Mechling] nor his family members ever contacted PHL, the California Trustee, the Administrative Trustee, or any other owner of the Policies to try to regain control of the Policies, unwind the transfer of the Policies, or assume responsibility for paying the Policies' premiums." Cayman SMF ¶ 69. Given the Mechlings' participation in the alleged STOLI scheme, the Estate thus would not be equitably entitled to the proceeds, even if it showed that the proceeds were established as part of a STOLI scheme. *See Giese v. Giese*, 9 N.W.2d 67, 68 (Wis. 1943) ("[E]veryone who engages in the fraud scheme forfeits all rights to protection, either at law or in equity."); *see also Gold*, 2025 WL 1808671, at *6 ("Ms. Gold was involved in obtaining the life insurance policy her Estate now contests, with full awareness of the terms of the transaction she was entering into, and she abided by that transaction (to her benefit, in the form of $90,000) for over fourteen years until she died. . . . Because Ms. Gold participated in, benefited from, and knowingly surrendered the proceeds from the transaction at issue, her Estate may not now claim that it was free from wrongdoing in the completion of that transaction.").

Even crediting the Estate's assertion that Mr. Mechling "didn't understand all the details of the Oceanus transaction," Estate SMF ¶ 23, the Estate fails to show evidence "of oppression,

imposition, hardship, undue influence, or great inequality of condition or age; so that his guilt may be far less in degree." *Evans*, 360 N.W.2d at 28; *see also Gold*, 2025 WL 1808671, at *6 ("Whether she knew that issuing a life insurance policy without an insurable interest violated the law is immaterial to whether her actions were sufficiently wrongful to bar equitable recovery. Her actions, even lacking this knowledge, suffice."). Instead, Cayman asserts, and the Estate does not dispute, that Mr. Mechling "was not easily taken advantage of, was described by his 'good personal friend' and accountant as a 'bright guy,' and 'very successful' as a businessperson, and would not typically sign a document without reading its contents."   Cayman SMF ¶ 7; Estate Opp'n to Cayman SMF at 4.

The Estate argues that the Court should consider the policy objectives to reach a contrary result. In particular, the Estate claims that *Gold* decision is distinguishable because it overlooks Wis. Stat. § 600.12(1) ("Unless otherwise provided, chs. 600 to 655 shall be liberally construed to achieve the purposes stated therein. Unless expressly provided otherwise or clearly appearing from the context the purposes stated shall constitute an aid and guide to interpretation but not an independent source of power."), and the legislative comment to Section 631.07(4) ("The best way to discourage insurers from issuing insurance policies to persons without insurable interest is to make them pay if they do, not to permit them freely to issue such policies knowing that they have a good public policy defense that lets them off the hook whenever a loss occurs. The court should have power to order the proceeds paid as justice dictates."). Estate Opp'n re Supp. Authority at 2–3. The Estate thus argues that because "literally the whole purpose of Section 631.07(4) is to thwart human-life wagerers," the best way to achieve this goal is to "[make] STOLI policies unprofitable for those investors by directing the proceeds to the insured's estate whenever possible." *Id*. at 3–4.

As discussed above, however, in enacting Section 631.07(4), the Wisconsin legislature chose a specific remedy to deter STOLI policies: rather than invalidating the policy, it "require[ed] the insurer to honor its promise." *Sun Life*, 839 F.3d at 655–56. In so doing, "[t]he legislature reasoned that 'the best way to discourage insurers from issuing insurance policies to persons without insurable interest is to make them [the life insurance companies] pay if they do, not to permit them freely to issue such policies knowing that they have a good public policy defense [the unenforceability of gambling contracts] that lets them off the hook whenever a loss occurs." *Id.* (citing Wis. Stat. § 631.07(4), Comment). As a result, where there is not an insurable interest, the remedy under the statute is not to invalidate the policy, but to determine whether another party is equitably entitled to the proceeds of the policy. *See Martin*, 349 N.W.2d at 92 ("Even if the Rathburns had no insurable interest in the subject of their policy, Tower was required to establish the policy's invalidity on other grounds. Tower has not done so."); *Midwest Com. Funding*, 399 F. Supp. 3d at 750 ("[E]ven if Midwest did not have an insurable interest in the entire property at the time of the loss, Cincinnati's obligations under the policy would not be limited to the amount of Midwest's interest."). While the party with an insurable interest may be equitably entitled to the proceeds, because Mr. Mechling was a willing participant in the STOLI scheme and his family financially benefitted from engaging in the behavior that Section 631.07(4) prohibits, as is the case here, there is not a genuine issue of material fact as to the Estate's equitable entitlement to the proceeds of the Policies.

Although the Estate believes its proposed remedy of distributing the proceeds to the decedent's Estate, regardless of the decedent's participation in the STOLI scheme, provides a better remedy than that set out by the Wisconsin legislature, "[t]his Court is not going to substitute its judgment for that of the Wisconsin legislature and courts." *Gold*, 2025 WL 1808671, at *7; *see*

*also id.* ("If Wisconsin wants to declare all stranger-originated life insurance transactions are payable to the insured's estate, regardless of the identity of the policyholder, it can certainly do so. But it has not. Instead, it has decided that the proceeds are payable to the policyholder, unless there is someone else who is equitably entitled to the proceeds." (citing 18 Del. C. § 2704(b); *then* Wis. Stat. § 631.07(4))); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 586 (2012) ("The court's "touchstone for any decision about remedy is legislative intent, for a court cannot use its remedial powers to circumvent the intent of the legislature." (citation omitted)).

Finally, while the Estate cites to the Supreme Court's 1881 decision in *Warnock v. Davis* for the proposition that "'equity and good conscience' entitle the estates of STOLI insureds to the proceeds . . . even though the insured was a knowing and consenting participant in the STOLI scheme," Estate Opp'n re Supp. Authority at 9 (citing *Warnock v. Davis*, 104 U.S. 775, 782 (1881)), this interpretation of *Warnock* cannot withstand scrutiny, to the extent relevant, given the subsequent actions of the Wisconsin legislature. *See Sun Life*, 839 F.3d at 656–57 ("[I]n 1975 the Wisconsin legislature, while retaining the common law principle forbidding the purchase of a life insurance policy by one who lacked an insurable interest, changed the remedy from cancelling the policy to requiring the insurer to honor its promise. . . . It is true that [Wis. Stat. § 631.07(4)] authorizes the court to order the death benefit paid to someone else, but only to a someone else who is equitably entitled to it."); *cf.* 18 Del. C. § 2704(b) ("If the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement or injury of the individual insured, the individual insured or the individual's executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.").

37

First, in *Warnock*, the court found that "[i]t was lawful for the association to advance to the assured the sums payable to the insurance company on the policy as they became due. It was, also, lawful for the assured to assign the policy as security for their payment." *Warnock*, 104 U.S. at 781. But "[t]he assignment was only invalid as a transfer of the proceeds of the policy beyond what was required to refund those sums, with interest. To hold it valid for the whole proceeds would be to sanction speculative risks on human life, and encourage the evils for which wager policies are condemned." *Id.* Thus, in *Warnock*, the decedent's widow was not entitled to the entire proceeds of the policy, as the Estate claims, but rather only to that amount left after the association was refunded for whatever amount it had paid on the policy's premiums. *See also Cammack v. Lewis*, 82 U.S. 643, 648, (1872) ("Under these circumstances, we think that Cammack could, in equity and good conscience, only hold the policy as security for what Lewis owed him when it was assigned, and such advances as he might afterwards make on account of it, and that the assignment of the policy to him was only valid to that extent.").

Second, the court assumed that "[n]o fraud or deception upon any one was designed by the agreement, nor did its execution involve any moral turpitude." *Warnock*, 104 U.S. at 781. Likewise, in *Cammack*, the court found that "[w]hether Lewis was a participant in the fraud, does not fully appear[,]" and "[did] not see such evidence on his part of a corrupt transaction, as to forbid the court from doing justice between his administratrix and Cammack, after the amount secured by the policy has been paid by the company to the latter." *Cammack*, 82 U.S. at 648 (1872).

Thus, neither *Warnock* nor *Cammack* stand for the proposition that where, as here, a decedent is a willing participant in and his family receives benefits from a STOLI scheme, his

estate is equitably entitled to the full proceeds of the policy or that the doctrine of unclean hands cannot fairly be applied where there is evidence of fraudulent conduct.[12]

As a result, because from the undisputed facts it "clearly appear[s] that the things from which the plaintiff seeks relief are the fruit of its own wrongful or unlawful course of conduct," the Court denies summary judgment to the Estate as there is no genuine issue of material fact as to its equitable entitlement to the proceeds of the Policies.[13]

## IV.    CONCLUSION

For the foregoing reasons, the Estate's motion for summary judgment, ECF No. 220, is **DENIED**.

U.S. Bank's and Cayman's motions for summary judgment, ECF Nos. 224 and 229, are **GRANTED**.

The Clerk of Court is respectfully directed to enter judgment for the Defendants, U.S. Bank and Cayman, and to close this case.

**SO ORDERED** at New Haven, Connecticut, this 8th day of August, 2025.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

[12] As discussed above, the applications for the Policies, signed by Mr. Mechling, indicated that "there [was no] intention that any party, other than the Owner, will obtain any right, title or interest in any policy issued on the life of the Proposed Life lnsured(s) as a result of this application." Ex. 7 to Estate's SMF, ECF No. 225-5 at 28; Ex. 8 to Estate's SMF, ECF No. 225-6 at 28. Under the Estate's theory of the case, this was untrue as the Policies were procured so that they could be transferred to Oceanus, and Mr. Mechling understood that he would be receiving compensation from Oceanus in exchange for his participation in this scheme. Thus, the applications for the Policies contravened Wisconsin law. To the extent the Estate argues that PHL "had deliberately sought out to issue STOLI policies," Estate Opp'n re Supp. Authority at 10 (emphasis removed), this lends further credence to the absence of a genuine issue of material fact as to the Estate's equitable entitlement claim because Mr. Mechling participated in a scheme that was "of that fraudulent kind with respect to which the courts regard the parties as alike culpable and refuse to interfere with the results of their action." *Warnock*, 104 U.S. at 781.

[13] While US Bank also argues that claims against it should be dismissed because the proceeds of the Policies were never its property, because the Court finds that the Estate fails to show equitable entitlement to the Proceeds, it does not reach these arguments here.